[Civ. No. 36389. Second Dist., Div. Four. Mar. 1, 1971.]

SIERRA FINANCIAL CORPORATION, Plaintiff and Respondent, v. BROOKS-FARRER COMPANY et al., Defendants and Appellants.

## COUNSEL

Max Fink, James R. Bramble and R. Stephen Duke for Defendants and Appellants.

Diamond, Tilem & Colden, Diamond, Tilem, Colden & Monkarsh and Herbert Colden for Plaintiff and Respondent.

## OPINION

KINGSLEY, J.—Brooks-Farrer Company and Jules Berman (appellants) appeal from a judgment entered on July 16, 1969, in favor of Sierra Financial Corporation (Sierra).[1] The essence of the court's disputed judgment was that Sierra was entitled to possession of an inventory of firelighters (blazers) and butane fuel which it bought at a secured investment (foreclosure) sale, damages for wrongful retention of the inventory (plus interest), and damages for storage charges owed to an intervener, Redman Van & Storage (Redman).

The crux of appellant's argument is that they bought the disputed goods free of respondent's secured interest "in the ordinary course of business" and that the subsequent foreclosure sale by respondent Sierra was invalid because it was not "commercially reasonable" under the California Commercial Code.[2]

Respondent is a personal property loan broker engaged in the business of industrial financing. On September 20, 1966, Genrus Engineering Specialties (Genrus) entered into a security agreement with Sierra by which Genrus granted Sierra a security interest in its present and after-acquired inventory. Genrus also executed financing statements in favor of Sierra covering present and future accounts, contract rights, and chattel paper. On September 23, 1966, both financing agreements were recorded with the Secretary of State of California. The purpose of these agreements was to secure loans made by Sierra to Genrus.

On September 28, 1966, Sierra loaned $12,000 to Genrus under the security agreement.

---

[1] Two actions (superior court No. 907021 in claim and delivery, and superior court No. 924925, for damages for slander of title) were consolidated and a single judgment was entered in the consolidated proceeding. The issues on this appeal do not turn on the procedural steps below and we do not set them out in this opinion.

[2] Unless otherwise indicated, all statutory citations herein are to the California Commercial Code.

In December 1966 and January 1967, Genrus was experiencing severe financial difficulties. Genrus' president, Mr. Goble, was at the same time interested in obtaining financing so that Genrus could obtain control of the sales of an "anti-exposure flight suit" which was to be manufactured by a company called Empress Incorporated (Empress). Goble was put in contact with Mr. Brooks of Brooks-Farrer and, subsequently, with Jules Berman. The three men met several times to discuss financing, during the course of which Brooks was shown a Genrus financial statement and learned that Sierra was factoring the accounts of Genrus. At a meeting on January 13, 1967, Brooks and Berman ostensibly purchased 17,900 blazers at $1.00 each and 7,000 cans of butane fuel at $.30 each. Genrus regularly sold the blazers for $2.23 or $3.30 each and the fuel for $.45 per can. At the time of the "sale," however, Brooks, on behalf of both appellants, agreed that Genrus could repurchase the blazers and fuel at their regular selling prices ($3.30, $2.23, $.45) less 10 percent.

Prior to this purported "sale," Brooks and Berman wanted to acquire controlling interests in Genrus, Empress and another company controlled by Goble named Starfire, Inc. On January 16, 1967, documents were prepared by appellants' attorney to convey the controlling interests in the companies and appellants gave Goble two checks totalling $30,000.

At the trial, evidence was introduced and the court made findings concerning many movements of cartons of the goods between Redman, the storage company used by appellants, and Genrus. These dealings are repetitive and merely add to the conclusion already inescapable from the facts outlined above that the "sale" of blazers from Genrus to Brooks and Berman was not for the purpose of transferring property interests in the blazers but for the purpose of financing Genrus and giving appellants control of the various businesses involved. During this time, an agent of Brooks and Berman, Charles Taub, was installed as an officer and manager of both Genrus and Empress. Taub was authorized to withdraw the inventory of blazers and fuel from Redman.

On February 1, 1967, Sierra demanded payment of Genrus' indebtedness and was informed by Taub that the debts would be paid. On March 3, 1967, Sierra learned of the removal of inventory from Genrus to Redman and demanded that appellants return the inventory. They refused and Redman also refused, stating it would be governed only by instructions from Brooks-Farrer, the depositor.

On March 16, 1967, notice of a foreclosure sale was served on appellants' attorney and Berman and, on March 17, publication of the foreclosure sale was made. The sale was held at Genrus' plant on March 24, 1967. The

trial court found, and the evidence supports the finding, that Genrus' indebtedness to Sierra was in excess of $14,000 on that date, after all proper credits had been applied to the debt. The agreement between Sierra and Genrus provided that Sierra could foreclose on demand and that it could foreclose on all properties of Genrus in payment toward any indebtedness.

Sierra was unable to obtain release of the inventory up to the time of the foreclosure sale on March 24, 1967. Sierra's opening bid at the sale was $500 for the inventory. No other bids were made although Goble and other agents of Genrus and of appellants were present.

■ At the outset, we note that appellants' claims are primary challenges to findings of fact made by the trial court. This court may not, of course, reweigh the evidence. (*Leonard* v. *Rose* (1967) 65 Cal.2d 589, 593 [55 Cal.Rptr. 916, 422 P.2d 604].)

## I

■ Appellants first argue that they were buyers "in the ordinary course of business" under Commercial Code section 9307[3] at the transaction of January 13, 1967, and therefore took free of Sierra's security interest. Although the code section provides that a purchaser may take free of a security interest even if he knows of a security interest, he must, nevertheless, be a buyer "in the ordinary course of business." Section 1201, subdivision (9)[4] of the code requires that such a purchaser act "in good faith" and that the transaction be "in the ordinary course" from a seller in the business of selling goods of that kind.

The trial court found (and, as already noted, there was ample supporting evidence) that the January 13th "sale" was not in good faith and was not in the ordinary course of business of either appellants or Genrus. The evidence shows the entire purpose of the "sale" was to finance the floundering Genrus enterprise and to provide the means for appellants to acquire

---

[3]Section 9307 reads as follows:
"(1) A buyer in ordinary course of business (subdivision (9) of Section 1201) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence."

[4]Section 1201, subdivision (9) reads as follows:
" 'Buyer in ordinary course of business' means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker. 'Buying' may be for cash or by exchange of other property or on secured or unsecured credit and includes receiving goods or documents of title under a preexisting contract for sale *but does not include a transfer in bulk or as security for or in total or partial satisfaction of a money debt.*"

control of Genrus and Empress from which they hoped to profit from the anticipated success of the (Empress) "flight suit." The evidence also supports the finding that the "sale" was not in good faith and was not in the ordinary course of business. The price at which the goods purportedly were "sold," coupled with the contemporaneous agreement for "resale" at a price close to the market price, amply evidences the implicit finding that the transaction was a security transaction expressly excluded from the statutory definition by the final clause of the section above quoted.

Appellants also argue that section 9205,[5] validating the "floating lien concept" in California requires that Sierra's interest apply only to the proceeds of the "sale." This section does not, however, alter the already discussed requirements of good faith and sale "in the ordinary course of business" (*Lincoln Bank & Trust Co.* v. *Queenan* (Ky. 1961) 344 S.W.2d 383, 387) and the argument is therefore specious.

## II

■ Appellants challenge the commercial "reasonableness" of the foreclosure sale under Commercial Code sections 9504[6] and 9507.[7] They rely upon the following for this contention of "unreasonableness": (a) inadequate notice, (b) failure to repossess the goods prior to sale and therefore to exhibit them, and (c) inadequacy of the price obtained at the sale.

As to notice of the sale, Sierra notified appellants' attorney and Jules Berman separately of the intended sale. Publication of the sale was also made. The sale was held after seven days' notice at the Genrus facility and Goble and other representatives of appellants and Genrus were present. It cannot be said, considering all of these facts, that the sale was inadequately noticed. (Com. Code, § 9504, subd. (3).)

As to possession and exhibition of the goods to be sold, appellants themselves admit that "Section 9504 does not explicitly require the secured party to take possession of the collateral prior to the foreclosure sale, . . ."

---

[5]Section 9205 reads as follows:
"A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle or dispose of all or part of the collateral (including returned or repossessed goods) or to collect or compromise accounts, contract rights or chattel paper, or to accept the return of goods or make repossessions, or to use, commingle or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral. This section does not relax the requirements of possession where perfection of a security interest depends upon possession of the collateral by the secured party or by a bailee."
[6]See Appendix A on page 705 following this opinion.*
[7]See Appendix B on page 706 following this opinion.

(Cf. Com. Code, § 9503.) Appellants cite, and we find, no authority to support the unreasonable proposition that respondent, who was prevented from taking possession of the inventory by appellants and their agent, Redman, should be thereby prevented from holding the foreclosure sale to which their agreement with Genrus entitled them. Further, the testimony of Mr. Labowe, then counsel for respondent, demonstrates that the inventory was described in detail as to both contents and location to the bidders at the sale. It thus appears that the foreclosure sale was conducted in as reasonable a manner as possible and that appellants should not now be allowed to contend that their own refusal to release the inventory should invalidate the sale. (Cf. *Phoenix* v. *Kovacevich* (1966) 246 Cal.App.2d 774, 780 [55 Cal.Rptr. 135] [foreclosure sale not invalidated even though property not exhibited].)

While it is true that there was a great disparity between the $500 bid by Sierra and the $27,616 found by the trial court to be the fair market value of the goods, this differential alone is not sufficient to invalidate the sale. Commercial Code section 9507, subdivision (2) provides: "The fact that a better price could have been obtained by a sale at a different time or in a different method . . . is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner."

As respondent points out, and as the trial court clearly considered, many other factors were present in this forseclosure sale: (a) Genrus' president, Goble, and its agents were present; (b) appellants were notified and could have been present; (c) no fraud or wrongdoing on behalf of respondent has been even suggested by appellants; (d) since Genrus, the manufacturer, was essentially out of business, the merchandise necessarily was "distressed," (e) appellants having refused to release the merchandise, its exact quantity and condition could not be ascertained at the time of the sale. It cannot be found as a matter of law that the trial court erred, considering all of the facts, in not finding that the sale price, alone, made the foreclosure sale "commercially unreasonable" and therefore invalid. (Cf. *Elster's Sales* v. *El Bodrero Hotel, Inc.* (1967) 250 Cal.App.2d 258, 261 [58 Cal.Rptr. 492]; *California Airmotive Corporation* v. *Jones* (6th Cir. 1969) 415 F.2d 554, 556.)

■ Appellants finally[8] urge that the trial court erred in finding that

[8]Appellants have also suggested that the trial court erred in precluding evidence of payments by Genrus *after* the foreclosure sale. Appellants cite no authority for such a suggestion. Its logical conclusion would negate the contractual right of respondent to foreclose under its agreement with its debtor. The debtor, Genrus, is protected against overpayment. Genrus has not appealed and its rights are not at issue in this case.

Genrus was indebted to Sierra on the date of the sale. The question was resolved by the trial court on the basis of all of the testimony and exhibits before it and appellants have failed to demonstrate why these records do not in fact show that Genrus was indebted to Sierra on a cash basis after all proper credits. No evidence presented by appellants compels a contrary result.

The judgment is affirmed.

Jefferson, Acting P. J., and Dunn, J., concurred.

A petition for a rehearing was denied March 17, 1971, and appellants' petition for a hearing by the Supreme Court was denied May 13, 1971. Peters, J., was of the opinion that the petition should be granted.

## APPENDIX A

Section 9504 reads as follows:

"(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. Any sale of goods is subject to the division on sales (Division 2). The proceeds of disposition shall be applied in the order following to

"(a) The reasonable expenses of retaking, holding, preparing for sale, selling and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;

"(b) The satisfaction of indebtedness secured by the security interest under which the disposition is made;

"(c) The satisfaction of indebtedness secured by any subordinate security interest in the collateral if written notification of demand therefor is received before distribution of the proceeds is completed. If requested by the secured party, the holder of a subordinate security interest must seasonably furnish reasonable proof of his interest, and unless he does so, the secured party need not comply with his demand.

"(2) If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency. But if the underlying transaction was a sale of accounts, contract rights, or chattel paper, the debtor is entitled to any surplus or is liable for any deficiency only if the security agreement so provides.

"(3) A sale or lease of collateral may be as a unit or in parcels, at wholesale or retail and at any time and place and on any terms, provided the secured party acts in good faith and in a commercially reasonable manner. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the secured party must give to the debtor, and to any other person who has a security interest in the collateral and who has filed with the secured party a written request for notice giving his address, a notice in writing of the time and place of any public sale or of the time on or after which any private sale or other intended disposition is to be made. Such notice must be delivered personally or be deposited in the United States mail postage prepaid addressed to the debtor at his address as set forth in the financing statement or as set forth in the security agreement or at such other address as may have been furnished to the secured party in writing for this purpose, or, if no address has been so set forth or furnished, at his last known address, and to any other secured party at the address set forth in his request for notice, at least five days before the date fixed for any public sale or before the day on or after which any private sale or other disposition is to be made. Notice of the time and place of a public sale shall also be given at least five days before the date of sale by publication once in a newspaper of general circulation published in the county in which the sale is to be held. Any public sale shall be held in the county or place specified in the security agreement, or if no county or place is specified in

the security agreement, in the county in which the collateral or any part thereof is located or in the county in which the debtor has his residence or chief place of business, or in the county in which the secured party has his residence or a place of business if the debtor does not have a residence or chief place of business within this State. If the collateral is located outside of this State or has been removed from this State, a public sale may be held in the locality in which the collateral is located. Any public sale may be postponed from time to time by public announcement at the time and place last scheduled for the sale. The secured party may buy at any public sale and if the collateral is customarily sold in a recognized market or is the subject of widely or regularly distributed standard price quotations he may buy at private sale. Any sale of which notice is delivered or mailed and published as herein provided and which is held as herein provided is a public sale.

"(4) When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interest even though the secured party fails to comply with the requirements of this chapter or of any judicial proceedings

"(a) In the case of a public sale, if the purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale; or

"(b) In any other case, if the purchaser acts in good faith.

"(5) A person who is liable to a secured party under a guaranty, indorsement, repurchase agreement or the like and who receives a transfer of collateral from the secured party or is subrogated to his rights has thereafter the rights and duties of the secured party. Such a transfer of collateral is not a sale or disposition of the collateral under this division."

## APPENDIX B

Section 9507 reads as follows:

"(1) If it is established that the secured party is not proceeding in accordance with the provisions of this chapter disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this chapter.

"(2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner. The principles stated in the two preceding sentences with respect to sales also apply as may be appropriate to other types of disposition. A disposition which has been approved in any judicial proceeding or by any bona fide creditors' committee or representative of creditors shall conclusively be deemed to be commercially reasonable, but this sentence does not indicate that any such approval must be obtained in any case nor does it indicate that any disposition not so approved is not commercially reasonable."