## Spickler v. Lombardo (No. 4)[1]

1. This case was before the court on pretrial issues in: 32 Somerset 16 (1976), 33 Somerset 340 (1977) and 34 Somerset 131, 3 D. & C. 3d 591 (1977).

*James A. Kudasik,* for plaintiff.

*Eugene E. Fike, II* and *John J. Dirienzo, Jr.,* of *Fike, Cascio & Boose,* for defendants.

*Robert M. Philson* and *Frank S. Lucente,* for additional defendants.

COFFROTH, *P.J.,* December 13, 1978—This case is before the court en banc on defendants' motions for judgment n.o.v. and new trial following a jury verdict for plaintiff in an action for fraudulent misrepresentations of title in a sale of goods by defendants to plaintiff.

Numerous troublesome legal issues permeated the trial and have been raised here, but we think one of them is dispositive of the case and is the only one which need be fully considered. Under Article 9 of the Uniform Commercial Code—Secured Transactions—of April 6, 1953, P.L. 3, as amended, 12A P.S. §9-101 et seq. (hereinafter called Code) governing secured transactions, is repossession of collateral following default an essential prerequisite of a private sale of the collateral by the mortgagee or his assignee and transfer of ownership to the buyer? The trial judge (Coffroth, *P.J.*) answered in the affirmative. Our present review leads us to conclude that the ruling was error and that defendants' motion for binding instructions should have been granted.

## HISTORY OF THE CASE

The parties are plaintiff Spickler, defendants Ben (otherwise known as Sebastian) Lombardo and Ben Lombardo Equipment Company, Inc., and additional defendants, Mr. and Mrs. Reese. Although the pleadings raised the issue of agency between

Ben Lombardo individually and his company, later stipulation of counsel conceded agency and eliminated that issue, so defendants can be treated as a unit.

Defendants, assignees of a defaulted chattel mortgage on which some of the goods in issue were collateral, sold the goods to plaintiff. Later, additional defendants, as judgment creditors of the chattel mortgage debtor and original owner of the goods, levied on and sold them at sheriff's sale thus depriving plaintiff thereof. Plaintiff filed this action against defendants for fraudulent misrepresentations of title, to recover purchase money paid to defendants and punitive damages for alleged outrageous conduct. Defendants joined the additional defendants alleging conversion of the goods.

At the trial, the court directed a verdict for additional defendants Reese, and the jury rendered a verdict for plaintiff against defendants for $7,750, the amount of purchase money paid, and for $1,000 punitive damages. The pending motions were then timely filed by defendants and argued before the court en banc.

## FACTS

The goods here involved consisted of three items of heavy equipment used in the strip mining of coal. The common source of title of all claimants in the case is one Paul Coleman, a strip mining operator, not a party. In 1965, Coleman borrowed money from Cambria Finance Company; repayment was secured by his note and a chattel mortgage listing numerous items of equipment, including two of the three items here involved. His stripping operation was in Southampton Township, Somerset County,

where the equipment was located. He ran into financial difficulties and was unable to pay any part of the chattel mortgage debt which went into default; he ceased mining operations and moved to Florida, leaving his equipment at the site of the stripping operation. It is not clear in the record who owned the coal he was stripping, but the surface land at the site was owned by Gomer, not a party, who in 1971 conveyed it to Mr. and Mrs. Reese, additional defendants.

The finance company, in an effort to realize on the collateral wrote two letters to Coleman, one dated March 6, 1968, addressed to him at Hyndman, Pa. where he lived when the money was borrowed, and the other dated April 25, 1968, addressed to him in Florida. The first letter threatens "to do whatever is necessary to close the account" unless Coleman responds by "the 15th of the month," and the second letter states: "We have no recourse but to take over the equipment and offer it for sale and this has been done. In case, however, you wish to redeem this equipment, please contact us at once." Not hearing further from Coleman, the finance company began disposing of the collateral. Some of it (not involved in this case) was sold to defendants in or about 1969. In 1970, defendants again negotiated with the finance company for the purchase of additional collateral, primarily the items here involved, and purchased the chattel mortgage from the finance company for $7,500, pursuant to which the finance company executed and delivered to defendants the following document dated October 24, 1970: "For value received we hereby assign to Ben Lombardo Equipment Co. of Fleetwood, Pennsylvania all our right, title and interest in the attached chattel mortgage of Paul

Coleman dated April 15, 1967, and authorize the Ben Lombardo Equipment Co. to take such action as might be necessary to repossess or dispose of the equipment listed in such chattel mortgage."[2]

During July and August, 1970, while defendants were negotiating with the finance company for the chattel mortgage assignment, they were also negotiating with plaintiff who was interested in buying the three items in suit, and the two transactions overlapped in time. Sometime in July before either of the transactions was consummated, the finance company discovered that one of the three items in suit, the Lorain shovel which had been priced at $500, was not on the list of mortgaged collateral; consequently it was agreed between the

---

2. At the trial defendants sought to prove that the transaction in which the assignment was given was "intended" by the finance company and defendants as a sale of the equipment, not an assignment of the mortgage as the terms of the document clearly state. The trial judge allowed a full explanation of the intent and understandings of the finance company and defendants as they might bear on the issues of fraud and good faith, but also ruled that the parol evidence rule made the testimony inadmissible as against plaintiff to alter the nature of the document from an assignment to a sale. Although plaintiff was not a party to the transaction, he derives his interest in the collateral through the document, and is therefore in privity with the parties. The parol evidence rule binds and protects the parties to the instrument and privies who claim through such parties. See Badler v. Gillarde Sons Co., 387 Pa. 266, 271-2, 127 A. 2d 680 (1956); Roberts v. Cauffiel, 283 Pa. 64, 128 Atl. 670 (1925); Johnson v. Stewart, 243 Pa. 485, 90 Atl. 349 (1914); Crew Levick Co. v. Philadelphia Invest. B. & L. Asso., 117 Pa. Superior Ct. 397, 405-6, 177 Atl. 498 (1935). The assignment is not ambiguous and no fraud or mistake in its making was alleged or proved. See Book Metals v. Sitkin Smelting & Refin., Inc., 254 Pa. Superior Ct. 21, 385 A. 2d 504 (1978); Kibler v. Midwest, 29 Somerset 255 (1974).

finance company and the defendants to reduce the amount to be paid by defendants from $7,500 to $7,000. By letter of July 31, 1970, defendants mailed their check for $3,500 to the finance company, leaving a balance of $3,500 for the assignment. On August 12, 1970, plaintiff bought from defendants the three items for $7,750 and on the same date paid to defendants $3,750 on account, leaving a balance of $4,000 to be paid in a week, and defendants thereupon executed and delivered a writing evidencing the sale which listed the items sold and the prices as follows:

| 54 B Bucyrus Crane | $6,500.00 |
|---|---|
| 25 Northwest Shovel | 750.00 |
| 75 Lorain Shovel | 500.00 |
| | $7,750.00 |
| Deposit | 3,750.00 |
| Balance | $4,000.00 |

The document also stated:

"All machine (sic) located in Hyndman, Pa., customer to remove all equipment. Sold as is where is. Free to be moved. Tax exempt."

By letter of the same date, August 12, 1970, defendants mailed their check to the finance company for $4,000 to pay off the balance due for the chattel mortgage assignment; since that amount failed to reflect the reduction of $500 for the Lorain shovel not listed on the chattel mortgage, the finance company by letter of August 13, 1970, brought the matter to defendants' attention and agreed to forward the assignment and the $500 refund. On the same date, August 13, 1970, defendants paid to Thomas and Frank Romesberg the sum of $250 for a right-of-way across their lands in

favor of plaintiff to remove the equipment. On or about August 18, 1970, plaintiff paid defendants the balance due of $4,000. By letter of August 24, 1970, the finance company forwarded to defendants the chattel mortgage assignment and the refund of $500. Defendants made no refund or offer of refund to plaintiff until after the sheriff's sale in 1975 when plaintiff refused the tender.[3]

The equipment remained at the stripping site until February, 1975, when it was sold at sheriff's sale by the additional defendants. In 1971, Gomer conveyed the land where the equipment stood to additional defendants Reese. On September 16, 1974, Reese filed a proceeding in foreign attachment and an assumpsit complaint in this court (223 Civil 1974) against Coleman and the equipment, claiming rental for use and occupancy of their land for storing the equipment from 1971 to 1974, in the amount of $6,800. The writ and complaint were served by the sheriff on October 23, 1974, by posting the equipment and by mail to Coleman in Florida; Coleman filed no answer. Reeses took a

---

3. Plaintiff's initial complaint filed October 23, 1975, and served on defendants on November 10, 1975, contained only an assumpsit count for breach of warranty; the amended complaint filed January 16, 1976, added the count in trespass now in issue. In pretrial proceedings, the court (Coffroth, *P.J.*) ruled that the assumpsit count was barred by the four year statute of limitations of the Code, but expressed some doubt whether the trespass count for fraud was governed by the four year statute or the six year statute of limitations. See Spickler v. Lombardo, 32 Somerset 16, 31-2 (1976). At the trial the six year statute was ruled applicable, making the trespass count timely filed. The issue of the statute of limitations was raised at the trial but has not been raised in post verdict motions and is therefore waived.

default judgment against Coleman on December 10, 1974, and on the same date issued their writ of execution. After levy and posting, the equipment was sold at sheriff's sale on February 19, 1975, to Reeses (execution plaintiffs), who later resold it.

Plaintiff testified that he visited the site about four times a year after he acquired the equipment from defendants, that he knew the land was not owned by defendants but by others who were strangers to the transaction, that it was his (plaintiff's) responsibility to move the equipment, that he did not take possession of or post the equipment, that he later learned that Reeses were the landowners and that he visited them in the summer or fall of 1974 and informed them of his ownership of the equipment, and that he would move it if they wanted but that he heard nothing further from them. Reeses testified that plaintiff's visit was after the sheriff's sale and that they had no previous knowledge of plaintiff or his claim.

A financing statement for the chattel mortgage was duly filed on May 10, 1967. There is no renewal, assignment, release, termination or other further record entry.

## DISCUSSION

### A. Motion For Judgment n.o.v.

Since this case involves and intertwines basic principles of fraud and deceit, warranty and secured transactions under the Code, having those basics well in mind is essential to a proper understanding and resolution of the controversy.

### 1. The Cause Of Action In Deceit:

This action in trespass is for damages for fraudulent misrepresentation by defendants to plaintiff

concerning their title rights to certain personal property sold by defendants to plaintiff. See Martachowski v. Orawitz, 14 Pa. Superior Ct. 175 (1900); compare 37 C.J.S. §56, 330, and 77 C.J.S. §43f, 680. The claim is for both compensatory and punitive damages. Compensatory damages are limited to actual losses and may not include loss of bargain: Savitz v. Weinstein, 395 Pa. 173, 178, 149 A. 2d 110 (1959); see also Scaife v. Rockwell-Standard Corp., 446 Pa. 280, 291-2, 285 A. 2d 451 (1971); Tilghman v. Dollenberg, 418 Pa. 604, 213 A. 2d 324 (1965); Restatement, 2d, Torts, §549. Punitive damages also are recoverable in tort actions if there is misconduct which can be classified as outrageous. See Spickler v. Lombardo (No. 1), 32 Somerset 16, 32 (1976), and Spickler v. Lombardo (No. 2), 33 Somerset 340 (1977); Restatement, Torts, §908.

The essential elements of a cause of action for deceit are: (1) a material misrepresentation of fact, opinion, intention or law, (2) which was fraudulent, (3) upon which plaintiff justifiably relied, and (4) a loss which plaintiff's justifiable reliance was a substantial factor in causing. See Scaife v. Rockwell-Standard, supra; Restatement, 2d, Torts, §525 et seq.

The term "misrepresentation" does not include or imply fraud. A *misrepresentation* of title is a *representation* that the person possesses some right or title which in fact or law he does not possess; a misrepresentation is a false or incorrect representation, but is neutral on the question whether the falsity or incorrectness was innocent or fraudulent. As stated in Comment b to §525 of Restatement, 2d, Torts:

"'Misrepresentation' is used in this Restatement to denote not only words spoken or written but also

any other conduct that amounts to an assertion not in accordance with the truth. Thus, words or conduct asserting the existence of a fact constitute a misrepresentation if the fact does not exist." See Neuman v. Corn Exchange Nat. Bank, 356 Pa. 442, 51 A. 2d 759 (1947).[4]

The misrepresentation alleged in this case is that defendants "represented to the plaintiff through statements and acts that the defendants had own-

---

4. This is not an action for breach of warranty. The relationship between fraudulent misrepresentation and warranty is well stated in 77 C.J.S. §304, 1120-21, as follows: "Representations in the nature of fraud and deceit may exist independently of any warranty, representations in the nature of warranty may exist independent of any deceit, and, where the facts are sufficient, the same representations may constitute either; the fact that there is a warranty does not preclude the existence of fraud grounded on the same representation, and vice versa. The elements of scienter and intent which . . . are essential to constitute fraud, need not be present in the case of warranty . . . An untrue representation, which is in itself of a nature sufficient for a fraud or for a warranty, if made by one properly chargeable wth scienter and for the purpose of inducing action by him who has acted on it, is a representation in the nature of fraud; if designed by the parties to a sale as forming part of their contract, it is [also] a warranty." It has been stated that an action in deceit cannot be based on an implied warranty: Erie City Iron Works v. Barber & Co., 102 Pa. 156 (1883); 37 C.J.S. §8, 224 note 89, citing DePasquale v. Bradlee & McIntosh Co., 258 Mass. 483, 156 N.E. 37, 39 (1927). We do not construe that as requiring that a misrepresentation must be verbally expressed, or to prevent implying or inferring from conduct and circumstantial evidence a misrepresentation in fact (as distinguished from deriving it from an implication of law), which may be the basis for an action in deceit. See Comment b to §525 quoted supra.

On the procedural relationship between an action in warranty and an action in deceit, see Zimmerman v. Glessner, 32 Somerset 74, 77-8, note [1] (1976).

ership, right to possession and right to sell" the three items of equipment in suit, that the "representations were false, and the defendant had no ownership, no title and no right to sell said equipment"; it is further alleged that plaintiff paid to defendants the sum of $7,750 for the equipment "upon the faith of defendants' representation that defendants had ownership, title, right to possession and right to sell the above mentioned equipment." The testimony of plaintiff on direct examination as to the representation relied on is as follows:

"Q. Did he tell you anything about who owned the machinery?

A. Well, I don't think—I don't think that was brought up at the time because I assumed that he owned the machinery. He wouldn't be selling me parts of it.

Q. Did he make any representations to you at any time concerning ownership of the machinery?

A. Well, like I say, I went up and looked at the parts and called him back and told him that the machine was in too good condition to tear it down. I'd be interested in buying the whole machine. And he said well, I'll just sell you everything that's up there.

Q. He said I'll sell you everything that's up there?

A. On the hill, right. I said, well, you give me a price on it and I believe it was right then that he gave me a price and I believe I said I'd think it over for a day or so. I called him back. I sent him a check then to guarantee the deal. And I went over to his place, I think, and took his other check to him and got a bill of sale or paper from him."

Plaintiff further stated on direct examination:

"Q. Did he make any representations to you at that time, inform you of anything other than he could sell it to you?

A. No sir. Only thing he said you buy the equipment as is, where is and he owned the equipment. That's all there was."

Plaintiff also testified on direct examination:

"Q. Had you ever heard of Cambria Finance Company?

A. I never heard of them.

Q. When did you first hear of Cambria Finance Company?

A. I might be mistaken and wrong about what I just said. Mr. Lombardo may have told me that he bought them from - - - - bought the machinery from Cambria Finance. He may have told me that when I first bought the machinery. I'm not sure about that.

Q. When you first thought you bought the machinery?

A. Yes. It was after this trouble started over it. Then I found out for certain that they at one time had a lien on the equipment. He may have said something about it, but I didn't pay any attention to it because he was selling it to me and I didn't care where he got it.

Q. But he told you that he owned it?

A. Sure."

Also on direct examination, plaintiff testified:

"Q. Did Mr. Lombardo tell you that you were free to take the equipment?

A. He told me that it was free to be moved and he put it in writing on the bill of sale, so I thought there was no problem. Well, it's not a bill of sale, it's a receipt that he gave me."

Defendant Lombardo testified that he owned the property, that he had bought from the finance company and that he had the title to convey to plaintiff, that he so informed plaintiff and made no misrepresentation.

Although not expressly alleged in the complaint, plaintiff testified that his loss occurred about four and a half years later when additional defendants had the property seized and sold by the sheriff, which he attributes to defendants' lack of legal right to sell the equipment to him.

The case was tried on the theory that defendants had no right to sell the equipment. Whether defendants had "ownership" as opposed to a "right to sell" under a security agreement is not material to the transaction. On materiality, see Kelly v. Herrington, 191 Pa. Superior Ct. 361, 156 A. 2d 601 (1959); Restatement, 2d, Torts, §538; compare Fatich v. Berkey, 30 Somerset 151 (1975), on materiality of misrepresentations in rescission. The primary trial issues then became: (1) whether defendants' representation of their right to sell the equipment was a misrepresentation, and (2) whether the misrepresentation was innocently or fraudulently made.

The trial judge ruled as a matter of law that under the instrument of assignment from the finance company, defendants obtained a security interest and the rights of the finance company therein under the Code. See Brandywine Lanes v. Pittsburgh Nat. Bank, 437 Pa. 499, 502, 506, 264 A. 2d 377 (1970). He also ruled as a matter of law that under the Code defendants had no legal right of sale, and passed no title to plaintiff, and so instructed the jury. The effect of that ruling was to convert defendants' representation of their right of

sale into a misrepresentation. The case was then submitted to the jury on the issues of fraud, causation and damages.

## 2. *Uniform Commercial Code:*

The two-fold basis of the trial judge's ruling against defendants' right of sale was: (1) a secured party has only such remedies of enforcement as the Code authorizes, and (2) the Code requires that in order for a secured party or assignee to sell collateral at private sale on default, the collateral must first be repossessed. It is conceded that neither the finance company as assignor nor defendants as assignee took possession of the equipment; instead, defendants' sale agreement with plaintiff required plaintiff to obtain possession. Our present review leads us to conclude that the first basis of the ruling was correct, but that the second basis requiring repossession as an indispensable condition of nonjudicial foreclosure was error.

It is clear that parties to a secured transaction have only such rights and remedies as the statute provides. The Code expressly states in §9-501(1) as follows: "When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in this Part [5]."

The code was intended to unify and codify the law pertaining to secured transactions: 33 P.L.E. §1, 165. Compare Code §1-103 and 79 C.J.S. Supp. §4, p. 8 and C.J.S. §4, 165. On exclusiveness of statutory remedies in general, see: Arcady Farms Milling Co. v. Sedler, 367 Pa. 314, 80 A. 2d 845 (1951); Com. v. Penner, 34 Somerset 364 (1977); Craig Estate, 30 Somerset 377 (1975); Kimmel v. County Commissioners, 29 Somerset 408 (1974) Appendix

[2]; 14 C.J.S. 1022, §367. Exclusiveness of statutory remedies of parties to chattel mortgages is underlined in Pennsylvania which outlawed chattel mortgages as against public policy in the absence of statute. See Arcady Farms Milling Co. v. Sedler, supra; First National Bank of Jamestown v. Sheldon, 161 Pa. Superior Ct. 265, 268-70, 54 A. 2d 61 (1947). The basis of that policy is primarily the common law rule that a pledge of personal property without a change of possession is invalid: First National Bank of Jamestown v. Sheldon, supra. That rule is primarily for the benefit of third parties, and a chattel mortgage may be valid between the parties under common law principles. See Kaufmann & Baer v. Monroe Motor Line Trans. Co., 124 Pa. Superior Ct. 27, 33, 187 Atl. 296 (1936), and Personal Finance Co. of N.Y. v. General Finance, 133 Pa. Superior Ct. 582, 3 A. 2d 174 (1938).

The pre-Code general chattel mortgage statute in Pennsylvania was the Act of January 24, 1956, P.L. (1955) 931, 21 P.S. §941.1 et seq. (repealed by the Code) which supplanted the Chattel Mortgage Act of June 1, 1945, P.L. 1358.[5] The provisions of that act are exclusive under the rule that where a remedy or method of procedure is provided by statute its provisions shall be strictly pursued and exclusively applied: Arcady Farms v. Sedler, supra, 317. Sections 8 and 9 of that act, 21 P.S. §§941.8 and 941.9, control remedies; on default they grant the mortgagee certain rights of foreclosure and repossession, and the right of nonjudicial sale of collateral is

5. The Act of July 15, 1936, First Ex. Sess., P.L. 47, 21 P.S. §841 et seq., is apparently still in force and pertains only to borrowing from the Federal government. See also 21 P.S. §831-837 governing mortgages of leaseholds.

specifically controlled by section 8(b), 21 P.S. §941.8(b), which provides in relevant part as follows: "In the event of the repossession of the mortgaged chattel, in accordance with the provisions of this section, the mortgagee may sell the chattel, at public or private sale, after giving a written notice of at least ten days thereof to the mortgagor . . ."

There is no provision in the statute defining the nature of the title acquired by the purchaser at such a sale, and we find no Pennsylvania authority on that subject; but, applying the rules of statutory construction above mentioned, it seems that default, repossession and notice are indispensable prerequisites to a valid nonjudicial sale of collateral, and that performance or nonperformance of those statutory requisites would govern not only the rights of the mortgagor against the mortgagee but the validity of the buyer's title at such a nonjudicial sale. The general rule elsewhere is that such title depends on the validity of proceedings under the statute before and including the sale. See 14 C.J.S. 1037, §385. It follows that, consistent with the trial judge's ruling, the pre-Code rule was that repossession of the collateral on default was an essential prerequisite to a transfer by the mortgagee or his assignee of the collateral to his purchaser and to cut off the debtor's title. Compare Uniform Conditional Sales Act (repealed) of February 28, 1956, P.L. (1955) 1147, secs. 8 through 11, 69 P.S. §§505.8 through 505.11.[5a]

---

5a. See also Motor Vehicle Sales Finance Act of June 28, 1947, P.L. 1110, 69 P.S. §601 et seq., §§623-626, and Jim Bulow Motors v. Beeman (No. 2), 33 Somerset 332 (1977), and id. (No. 3), 34 Somerset 16 (1977), involving that act.

As above stated, the Code provisions prescribing remedies on default are likewise exclusive in accordance with the provisions of Part 5. There we find language substantially different from that of the prior chattel mortgage statutes; as stated in Sierra Financial Corp. v. Brooks-Farrer Co., 15 Cal. App. 3d 698, 93 Cal. Rptr. 422, 425 (1971), the Code "does not explicitly require the secured party to take possession of the collateral prior to the foreclosure sale . . ." Although we will find that case helpful in our later discussion, it does not clearly decide the issue which we face here, and we have found none that does so.

As we analyze Part 5 of the Code, the secured party clearly has the following remedies on default: (1) Judicial foreclosure, expressly provided for in §9-501(1); there was no judicial foreclosure in this case. And (2) The rights and remedies provided for in the security agreement, as stated in §9-501(2); the security agreement in this case provides that on default "the mortgagee may take possession of said chattels wherever found and may sell the same at such time and place as it may see fit after giving ten days written notice thereof to the mortgagor . . ., or the chattel mortgage may be foreclosed by any of the methods authorized by law . . . The mortgagee may pursue any other course or seek any other remedy permitted or provided by law."

The contractual right of sale is contingent upon repossession and giving the prescribed notice.[6]

---

6. Had the finance company elected to foreclose instead of to assign the mortgage, its letters to Coleman would not qualify as notice to the mortgagor because they do not specify time and place of sale as required by the terms of the mortgage.

Since neither was done, the sale to plaintiff cannot be sustained under the mortgage, and disposition is governed solely by the Code.[6a] And (3) Repossession as authorized by §9-503, which provides as follows:

"(1) Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. If the security agreement so provides the secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties. Without removal a secured party may render equipment unuseable, and may dispose of collateral on the debtor's premises under section 9-504.

"(2) If a secured party elects to proceed by process of law he may proceed by writ of replevin or otherwise."

After repossession, the secured party's rights to dispose of the collateral are set forth in section 9-504. There was no repossession in this case.

All remedies under the Code are cumulative: Section 9-501(1).

The only other possible source of remedy for the secured party on default is contained in section 9-504 governing nonjudicial disposition of collateral after default (referred to above in connection

---

6a. It should be noted that the security agreement expressly contemplates foreclosure by any non-contractual method "authorized . . . permitted or provided by law"; Code §9-501(3) limits the power of contracting parties to waive or vary the remedial provisions of the Code.

with repossession), which provides in relevant part as follows:

"(1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. Any sale of goods is subject to the Article on Sales (Article 2). The proceeds of disposition shall be applied in the order following to . . .

"(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable . . . reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor . . .

"(4) When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this Part [5] or of any judicial proceeding

"(a) in the case of a public sale, if the purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale; or

"(b) in any other case if the purchaser acts in good faith . . ."

The real pinch of the case, therefore, is whether the foregoing provisions of section 9-504, prescribing the secured party's rights of nonjudicial disposition of collateral after default and the nature of the rights of a purchaser of the collateral in such disposition, may be construed as authorizing such disposition without repossession.[7]

Defense counsel stresses and correctly points out that the language of section 9-503, supra, granting to the secured party the right of repossession, is permissive, and does not mandate repossession as a duty; and that section 9-504, supra, conditions the secured party's rights of disposition only "after default," saying nothing of repossession. That language, compared with the substantially different wording of the Chattel Mortgage Act of 1956, supra, making a repossession a condition of disposition by the chattel mortgagee, strongly suggests a change in law and that repossession is not a mandatory prerequisite of disposition of the collateral by the secured party under the Code.

Nevertheless there are some reasons for thinking that repossession is mandatory. The last sentence of section 9-503(1), supra, authorizing the secured party to repossess and render equipment unuseable "without removal," and the Comment thereto that the clause was included to take care of cases involving "heavy equipment" whose "physical removal

7. Section 9-504 is captioned: "Secured Party's Right to Dispose of Collateral After Default; Effect of Disposition." Code §1-109 provides: "Section captions are parts of this Act."

may be expensive or impractical," suggest that removal or some practical or functional substitute is contemplated. The Pennsylvania Bar Notes to section 9-504 speak only of the right of disposition in terms of the "secured lender who had repossessed the collateral," and Comments 1, 5 and 6 to the section likewise confine their remarks to a secured party "in possession" and to disposition "after repossession"; although those Comments refer to prior laws, their context appears to presuppose repossession by the secured party under the Code. Section 9-505(1) which compels disposition of collateral within 90 days under certain circumstances also assumes that repossession will precede disposition, at least in the case of consumer goods; the context indicates that the restriction of the subsection to consumer goods is related to the duty of compulsory disposition, not to any duty of repossession which appears to be assumed there as having occurred.[8]

Practical considerations strongly support the need for repossession before nonjudicial sale. Without repossession, the buyer in most cases will be deprived of the opportunity to examine the goods

8. Section 9-505(1) provides: "If the debtor has paid sixty per cent of the cash price in the case of a purchase money security interest in consumer goods or sixty per cent of the loan in the case of another security interest in consumer goods, and has not signed after default a statement renouncing or modifying his rights under this Part [5] *a secured party who has taken possession* of collateral must dispose of it under section 9-504 and if he fails to do so within ninety days *after he takes possession* the debtor at his option may recover in conversion or under section 9-507(1) on secured party's liability." (Emphasis supplied.)

before purchase; the parties will be deprived of the protection of the goods from injury, concealment, third party seizure and the like, which repossession would help to secure against; and repossession must still be accomplished after the sale by and at the risk of one or the other of the parties thereto. These practical considerations can be expected to have other undesirable consequences which it is the policy of the Code to avoid: the ability of the secured party to realize the best price is impaired, to the prejudice of the secured party and the debtor; and the ability of the secured party to transfer and the purchaser to acquire a good title against the world is jeopardized to the prejudice of all concerned. Moreover, the secured party's nonpossession will likely put the purchaser of collateral on sufficient inquiry respecting outstanding rights of the debtor, and possibly others, in the goods as to deprive him of the status of a good faith purchaser. See: Code section 9-504(4)(b), supra, and Comment 4 thereto; 11 C.J.S. 388; compare Code §1-201(19) and Comment 19 thereto defining "good faith."

Literature and case law on the subject are skimpy and have not grappled with the issue of the essentiality of repossession to a valid nonjudicial disposition after default. The decisions we have read (except possibly Sierra, supra, hereinafter discussed) assume repossession. At least one authority has taken a categorical position, without rationale or supporting citation; in White and Summers, Uniform Commercial Code (West, Hornbook Series, 1972), Chapter 26, §26-5, page 966: "If after default, the secured creditor chooses to satisfy the debt by means of strict foreclosure or by resale of the collateral, *he must first repossess it.*" (Em-

phasis supplied.)[9] The trial judge followed that view and, with considerable justification, treated repossession as a mandated prerequisite to transfer of the debtor's title in defendants' sale to plaintiff. See also 14 C.J.S. §372b, p. 1028.

Nevertheless, the fact that the Code omits use of the language of prior statutes conditioning nonjudicial disposition on repossession, and leaves the issue open, takes on greater significance, and sticks out as a sore thumb, the more one studies the problem disenthralled of prior notions.

The key to solution lies in the provisions of section 9-504 which, for the first time in security transaction statutes, specify the consequences of improper disposition, and place those consequences in separate categories as respects: (1) the effect of an improper disposition on the secured party's liability to the debtor, and (2) the effect of an improper disposition on the transferee's title. The criterion of liability of the secured party to the debtor as respects disposition of collateral is that "every aspect of disposition including the method, manner, time, place and terms must be commercially reasonable," as provided in sections 9-504(3) and 9-507. The criterion for determining whether secured party's buyer at private sale obtains the debtor's title is the

---

9. The term "strict foreclosure" refers to the process whereby the secured party after default and repossession accepts or retains the collateral in complete satisfaction of the debt as authorized in Code §9-505(2), without attempting any disposition under section 9-504, supra. See White and Summers, supra, §26-8, in which section 9-502(2) is miscited for section 9-505(2). White and Summers use the term "resale" to include nonjudicial sale of collateral by the secured party even though he was a lender and not a seller.

buyer's good or bad faith in making the purchase; a good faith purchaser "takes free of all such rights and interests [rights of debtor, secured party and subordinate interests] even though the secured party fails to comply with the requirements" of commercial reasonableness: section 9-504(4). A good faith buyer will obtain the debtor's title to the goods unimpaired by defects in the disposition, although the secured party seller will be liable to the debtor under Code §9-507(1) for a wrongful disposition in violation of the debtor's rights.[9a] So, nonrepossession must be separately evaluated as bearing on commercial reasonableness or unreasonableness for purposes of determining liability of the secured party to the debtor, and as bearing on the good faith of the buyer at a private sale of nonrepossessed collateral. As previously suggested, nonjudicial disposition of unrepossessed collateral might be commercially unreasonable as to the debtor, and the bona fides of the purchaser might also be adversely affected.[10]

---

9a.  Code §9-507(1) provides in part that: "If the disposition has occurred the debtor or any person entitled to notification or whose security interest has been made known to the secured party prior to the disposition has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part [5]."

10.  If the secured party is both seller and buyer at a commercially unreasonable sale, he is probably not a good faith purchaser. As stated in Secured Transactions Under UCC by Coogan-Hogan-Vagts (Matthew Bender 1963), Vol. 1A §8.04[2] [d] [ii]:

"An interesting question is presented by the interrelationship between these provisions authorizing the secured party to purchase and subsection four of section 9-504, which protects certain purchasers for value. Will the secured party be able to

We think the significance of the Code's silence on the essentiality of repossession in a nonjudicial disposition of collateral after default means that the effect of repossession or nonrepossession must be evaluated on a case by case basis, in terms of the separate criteria established in section 9-504 for determining the secured party's liability to the debtor and the nature of the title acquired by the purchaser, as opposed to mandating repossession as a mechanistic precondition in all cases. The only relevant decision we have found supports this view. In Sierra Financial Corp. v. Brooks-Farrer Co., supra, it was contended that the secured party's sale of the collateral (inventory goods) was commercially unreasonable on several grounds including "failure to repossess the goods prior to sale and therefore to exhibit them." On this point the court said p. 425:

"As to possession and exhibition of the goods to be sold, appellants themselves admit that 'section 9504 does not explicitly require the secured party to take possession of the collateral prior to the foreclosure sale, . . .' (Cf. Com. Code §9503). Appellants cite, and we find, no authority to support the unreasonable proposition that respondent, who was prevented from taking possession of the inven-

claim the protections afforded if he is a purchaser for value? Since one of the major aims of the protections rule seems to be the safeguarding of an innocent third party when the secured party fails to comply with the applicable law, it would appear that the secured party should not be able to cloak himself in the mantle provided for strangers. Even when the secured party buys at a public sale and when he is honest in fact, if he has failed to comply with the requirements of the Code, he probably should not be insulated from the debtor's claims."

tory by appellants and their agent, Redman, should be thereby prevented from holding the foreclosure sale . . ."[11]

We are inclined to think that repossession is or will prove to be essential to commercial reasonableness in the absence of special circumstances, such as were present in Sierra; but since our present case does not involve liability to the debtor, we need not decide commercial reasonableness.[12] Similarly we think that repossession is or will prove to be essential to a good faith purchase in the absence of special circumstances; but we need not hold dogmatically to that broad proposition and

11. In Sierra, the secured party was also the purchaser at the sale of the collateral, and the action was for damages by Sierra against other creditors of the debtor who claimed title from the debtor and withheld possession from Sierra. The court found the sale commercially reasonable; had it been found otherwise, the Comments in Footnote [10], supra, would become pertinent.

12. There are some factors in the instant case which might make the sale to plaintiff commercially reasonable despite nonpossession: the purchaser had opportunity to inspect the goods, the goods were heavy equipment and it was impractical or at least difficult to move them to a protected place, neither the debtor nor any other person had actual possession and there was no obstacle to plaintiff's taking actual possession promptly or within a reasonable time.

Notification to the debtor as prescribed in section 9-504(3), supra, is also an important element in commercial reasonableness. What is "reasonable notification" will depend on circumstances, and should take into account the debtor's right of redemption under section 9-506. Defendants gave no notice; had the finance company elected to foreclose instead of to assign the chattel mortgage, whether its letters to Coleman comply with section 9-504(3), supra, might be an issue (see footnote [6] supra).

need only decide whether nonrepossession impairs the title which this plaintiff acquired at private sale from defendants.

In the present case, the facts give a special twist to the requirement of good faith, in view of the fact that plaintiff as purchaser claims he was defrauded as the result of his justifiable (good faith) reliance on defendants' misrepresentations. Although there may be differences in the concepts of justifiable reliance in a deceit action and good faith under the Code as respects the duty of inquiry (see Restatement, 2d, Torts, §§540, 541A and 545A, and Comment 4 to Code §9-504 and 11 C.J.S. p. 388), it seems plain that plaintiff may not prove that defendants' representation of their right of sale was false merely by proving that he got no title under section 9-504(4)(b) by reason of his own bad faith (unjustifiable reliance) in the purchase. The bad faith of the purchaser is a weapon in the hands of the debtor or his successor in interest in a controversy with the bad faith purchaser (or his successor in interest), not a weapon in the hands of the purchaser to prove he got no title in a controversy with the secured party as seller. The doctrine of bona fide purchaser is not a rule of property, but a rule of equity and must be so applied. See German Savings & Loan Society v. DeLashmutt, 67 Fed. 399 (D. Ore. 1895); Basch v. Tide Water Associated Oil Co., 49 Cal. App. 2d 743, 121 P. 2d 545 (1942); 11 C.J.S. 389 at Notes 64 and 65. Therefore, as between plaintiff and defendants, section 9-504(4) is operative and transfers to plaintiff "all of the debtor's rights therein [the collateral], discharges the security interest under which it is made and any security interest or lien subordinate thereto" irre-

spective of plaintiff's good or bad faith in the purchase. Therefore, defendants' representation of their right to sell to plaintiff was not a misrepresentation.[13]

Consequently, defendants as assignee of the defaulted chattel mortgage had the full legal right and power to sell the two items of equipment listed thereon as collateral, they lawfully transferred ownership thereof to plaintiff, and there was no material misrepresentation by defendants as to those items and no cause of action in plaintiff for deceit in their sale.

Other considerations support this conclusion. There is nothing in the law which requires physical delivery by seller to buyer to perfect a sale of per-

---

13. Code §9-504 thus permits the secured party seller to deprive debtor of his property rights in the collateral by nonjudicial public or private sale without notice or opportunity to be heard, relegating debtor to the right to recover damages from the secured party under section 9-507(1), quoted in footnote [9a] supra, for violation of debtor's right to notice. The constitutionality of these provisions was raised by the court in reargument, but was not raised by any party in the case.

Ordinarily, only the debtor has standing to raise a violation of his constitutional right: 124 North Centre Inc. v. Doyle, 27 Somerset 113, 116 (1972); but since it is important here to determine whether plaintiff obtained from defendants a title to the collateral good against all the world (including the debtor), on which issue Code §9-504 is decisive, both plaintiff and defendants would appear to have a litigable interest in its validity had they raised the question.

In any event, Code §9-504 appears to be constitutional. See Flagg Bros. v. Brooks, 436 U.S. 149, 98 S. Ct. 1729, 56 L.Ed. 2d 185, 196 (1978); Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S. Ct. 1895, 40 L.Ed. 2d 406, 420-21 at notes 13 and 14 (1974); Gibbs v. Titelman, 502 F. 2d 1107, 1113 (CA. 3d Cir. 1974), cert. denied 419 U.S. 1039, 95 S.Ct. 526, 42 L.Ed. 2d 316 (1974); Klink v. Whalley Ford Sales, 35 Somerset 151 (1977), Shaulis, J.

sonal property and pass a valid title thereto as between the parties, or which prevents the parties in such a transaction from voluntarily placing upon the buyer the obligation and risk of obtaining the possession. See: Ridgway v. Baizley Iron Works, 46 Pa. Superior Ct. 267 (1911); Selznick v. Holmes Pitts. Auto. Co., 275 Pa. 1, 118 Atl. 553 (1922); 77 C.J.S. §§131-133, 93-94; 32 P.L.E. §112, 10; on effect of nondelivery on third parties, see: Caulfield v. Van Brunt, 173 Pa. 428, 433, 34 Atl. 230 (1896); Sum. Pa. Jur. Sales, §§226-233. The rule stated is the same under Code §2-503 of article 2 on sales, which by the express provisions of section 9-504(1), supra, governs sales of collateral by the secured party; the seller's obligation is to put the goods *"at the buyer's disposition"* as provided in the contract. As between the parties to the sale, title passes when the goods are identified to the contract and the seller completes his contractual obligations with respect thereto. See Code §2-401(1) and (2). Under those provisions, plaintiff acquired title to the collateral purchased from defendants, without repossession thereof.

As to the third item of equipment (Lorain shovel) which was not collateral, defendants had no legal right of sale and did misrepresent their right to sell it (which the jury found was fraudulent).

The statute authorizing the entry of judgment n.o.v. when a point for binding instructions has been reserved or declined at the trial: Act of June 3, 1971 P.L. 124, sec. 1, 12 P.S. §681, states that ". . . it shall be the duty of the court, if it does not grant a new trial . . . to enter such judgment as should have been entered on that evidence . . ." It is clear that a trial court is not bound to enter judgment n.o.v. in every case in which it believes binding instructions should have been given at the trial; if justice re-

quires, the court may instead give another chance to the opponent of the motion by awarding a new trial. See Bunn v. Furstein, 153 Pa. Superior Ct. 637, 34 A. 2d 924 (1943); 20 P.L.E. §151, 286. But there must be a substantial basis for opting for the new trial instead of judgment n.o.v. As stated in Lindner v. Friedel, 414 Pa. 436, 438, 200 A. 2d 771 (1964): "A court, once refusing judgment n.o.v., may not, in the spirit of a consolatory prize, offer a new trial to a discomfitted litigant. A new trial is a serious business. It involves great expenditure of time, money and nervous tension."

In this case, the record shows rather clearly that the judgment that "should have been entered" on the evidence is one for plaintiff for $500, the amount paid for the Lorain shovel for which he got no title. The amounts paid by plaintiff for each of the three items of equipment purchased are itemized on the invoice or bill of sale given by defendants to plaintiff, which shows that plaintiff paid $500 for the Lorain shovel. That is the precise and only amount which plaintiff has claimed as compensatory damages for the loss of that item, and that is the amount awarded in the jury's verdict, which, although not itemized, is for the precise total amount paid for the three items shown on the invoice. Most important, defendants have conceded liability for that amount and tendered that amount to plaintiff, which he refused. In the absence of such admission, the trial court could not have directed a verdict for plaintiff for that amount. See Nanty-Glo Bros. v. American Surety, 309 Pa. 236, 163 Atl. 523 (1932); Fuller v. Fuller, 158 Pa. Superior Ct. 378, 45 A. 2d 231 (1946); 38 P.L.E. §202, 212. Similarly, in the absence of such admission the court could not enter judgment n.o.v. for plaintiff for that amount. See Dalmas v. Kemble,

215 Pa. 410, 64 Atl. 59 (1906); Ellsworth v. Husband, 119 Pa. Superior Ct. 245, 181 Atl. 90 (1935); Carrow v. Massachusetts Bonding & Ins. Company, 72 Pa. Superior Ct. 498 (1919); 20 P.L.E. §143, 262. In view, however, of the admission of the full amount claimed for the item in question, a judgment for the amount of that item is in effect a judgment for defendant. Compare Pavia v. State Mutual Life Assur. Co., 179 Pa. Superior Ct. 272, 274, 116 A. 2d 762 (1955). Justice is properly served by the entry of judgment n.o.v. for the amount admitted, but would not be served by granting a new trial on the amount of compensatory damages for the Lorain shovel under these circumstances.

Such a judgment does not dispose of the unliquidated claim for punitive damages which would have to be submitted to the jury in a new trial, if the evidence warrants such a claim. During the trial, the trial judge in denying defendant's objection to submission to the jury of the punitive damage claim expressed doubt about the sufficiency of the evidence to support it. Our present review of the record, especially in light of our present rulings, leads us to conclude that as a matter of law the evidence of misrepresentation by defendants of their right to give plaintiff a good title to the Lorain shovel does not rise to the outrageous conduct required to support punitive damages. See Restatement, Torts, §908.

The proper disposition, then, in granting defendants' motion for judgment n.o.v. is to enter judgment for plaintiff for $500.

B. *Motion For New Trial:*

Having decided that judgment n.o.v. should be

granted, we have no need to consider defendants' motion for new trial, and, although that motion might be entitled to serious consideration on the issues of both fraud and causation (see Restatement, 2d, Torts, §§546 and 548A), it will be denied.[14]

Nor will we disturb the directed verdict for the additional defendants. Plaintiff has filed no conditional motion for new trial. See Potanko v. Sears Roebuck & Co., 368 Pa. 582, 588-9, 84 A. 2d 522 (1951); 28 P.L.E. §71, 79. And we think that justice will not be served by granting a new trial as to additional defendants on our own initiative. See Potanko v. Sears Roebuck, supra; Schmidt v. Kratzer, 402 Pa. 630, 168 A. 2d 585 (1961); 28 P.L.E. §72, 81.

## ORDER

Now, December 13, 1978, defendants' motion for new trial is denied; their motion for judgment n.o.v. is granted, and judgment is here entered for plaintiff Franklin P. Spickler against defendants Ben Lombardo, also known as Sebastian Lombardo, and Ben Lombardo Equipment Company, Inc., for $500.

I Concur:

SHAULIS, J.

---

14. In passing on the sufficiency of evidence of fraud in an action in deceit for damages, the usual rule of the preponderance of the evidence controls, not the stricter burden of proof of fraud applicable in setting aside or reforming a contract: Dunbar v. Preston, 285 Pa. 502, 132 Atl. 707 (1926); Bruce v. Loeb and Loeb, 78 Pa. Superior Ct. 22 (1921); 16 P.L.E. §30, 470; Sum. Pa. Jur., Torts I, §343. The higher burden is defined and applied in Brown v. Shockey, 28 Somerset 288 (1973), reformation in equity; see also Kibler v. Midwest, 29 Somerset 255 (1974), reformation at law.