FEDDERS CORPORATION, Plaintiff,

v.

Richard L. TAYLOR, Gertrude P. Taylor, Edward R. Cameron and Judith Cameron, Defendants.

FEDDERS FINANCIAL CORPORATION, Plaintiff,

v.

T. C. DISTRIBUTORS, INC., Defendant.

Nos. 4–75–Civ. 291, 4–76–Civ. 28.

United States District Court, D. Minnesota, Fourth Division.

June 1, 1979.

James R. Dorsey, Minneapolis, Minn., for plaintiffs.

Dennis J. Holisak, Bloomington, Minn., for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

LARSON, Senior District Judge.

The above captioned cases were tried to the Court for two days commencing on February 22, 1979. Based upon the evidence adduced at trial and upon the files, records and proceedings herein, the Court makes the following Findings of Fact, Conclusions of Law, and Order for Judgment.

### FINDINGS OF FACT

#### [JURISDICTION AND PROCEDURAL BACKGROUND]

1. Plaintiffs Fedders Corporation (Fedders) and Fedders Financial Corporation (FFC) are New York corporations with their principal place of business in New Jersey. During all times relevant herein, Fedders Corporation has been, *inter alia*, a manufacturer of commercial and residential central air conditioning (CAC) and room air conditioning (RAC) units and parts. FFC is a wholly owned subsidiary of Fedders.

2. Defendant T.C. Distributors, Inc. (T.C.) is a Minnesota corporation with its principal place of business in Minnesota. During the summer of 1973, T.C. became the Fedders CAC distributor for Minnesota, North Dakota, South Dakota, and a western portion of Wisconsin. Defendants Richard L. Taylor, Gertrude F. Taylor, Edward R. Cameron and Judith Cameron are all citizens of Minnesota.[1] Defendants Richard Taylor and Edward Cameron were the principal owners of T.C.'s corporate shares.

3. Fedders commenced its action against the Taylors and the Camerons on June 30, 1975. Federal jurisdiction was predicated on diversity of citizenship, 28 U.S.C. § 1332. In the action Fedders alleged a claim for a deficiency judgment against the Taylors and the Camerons based upon their written unconditional guaranty of the obligations of T.C. to Fedders. The amount of the deficiency claimed, including expenses of foreclosure and agreed upon attorney's fees, was $176,071.71 plus interest.

4. Defendants served their joint and separate answer to the Fedders complaint on or about June 6, 1976. In their answer,

---

1. Richard and Gertrude Taylor are husband and wife, as are Edward and Judith Cameron.

defendants admitted the jurisdiction of the Court, the execution of a guaranty, the amounts owed Fedders by T.C., the basic facts of the foreclosure sales, and the amounts bid and realized at the sales (Ans. ¶¶ II, III, and IV). Defendants denied certain other allegations of the complaint and alleged two affirmative defenses. The first affirmative defense alleged was that Fedders

". . . without notice or cause and [in] breach of the Franchise Agreement and in violation of M.S.A. 80C, willfully, wrongfully and wantonly appropriated all of said Plaintiff's (sic) inventory, office personnel, dealers, telephone and business good will."

The second affirmative defense alleged that Fedders' "actions in obtaining possession of the appliances, parts and accessories and the amount thereafter bid in at sale [were] commercially unreasonable."

5. FFC commenced its action against T.C. on January 20, 1976. Jurisdiction was again based upon diversity of citizenship under 28 U.S.C. § 1332. FFC's action alleged sixteen counts. The first count asserted a claim for deficiency judgment against T.C. based upon certain demand promissory notes (Pl.Exs. 31 and 32) and upon a written security agreement (Pl.Ex. 30) wherein T.C. granted FFC a security interest in inventory, accessories and parts, and the proceeds thereof. The amount of the deficiency claimed by FFC including reasonable expenses of caring for and conducting the sale was $32,739.84 plus interest and attorney's fees at the agreed rate provided in the notes and the security agreement. The remaining counts of FFC's complaint were voluntarily dismissed by FFC at trial.

6. T.C. served its answer to FFC's complaint on July 20, 1976. In response to Count I of the complaint, T.C. made certain admissions including the amount owed on the demand indebtedness, the existence of FFC's security interest, the fact of the foreclosure sale, the bid in price at the sale and the giving of due notice to T.C. of the sale. In response to Count I, T.C. affirmatively

alleged that the repossession of collateral and the subsequent sale were undertaken in a commercially unreasonable manner (Ans. ¶ IV).

7. The above two matters were consolidated for trial and tried in February, 1979. At the completion of plaintiffs' cases, counsel for defendants agreed that proof regarding reasonable attorney's fees was not necessary and that any award of attorney's fees would be governed in the Fedders matter by the ten percent figure (10%) stated in the guaranty (Pl.Ex. 29) and in the FFC matter by the fifteen percent figure (15%) contained in the notes and security agreement. In addition, the parties agreed that the interest rate for the FFC claim would be computed from the date of the sale at the minimum nine percent rate (9%) provided for in the notes (Pl.Exs. 31 and 32).

## [THE FEDDERS CLAIM]

8. On or about August 27, 1973, the Taylors and the Camerons executed a written unconditional guaranty of the payment, when due, of each and every obligation and liability of T.C. to Fedders of any nature, whether then existing or thereafter incurred (Compl. ¶ II, admitted in Ans. ¶ II). In addition to unconditionally guaranteeing the obligations of T.C. to Fedders, the defendants by their unconditional written guaranty also agreed that if an attorney was used to enforce the guaranty, they would pay an attorney's fee of ten percent of the principal and interest then owed Fedders by T.C. (Pl.Ex. 29).

9. Subsequent to execution of the guaranty, T.C. entered into a Warehouse Plan and Security Agreement with Fedders and with NYTCO Services, Inc., a bonded warehouse company (Pl.Ex. 1). Under the terms of the Warehouse Plan and Security Agreement, T.C. was permitted to purchase goods from Fedders on credit in order to have readily available an adequate supply of appliances from which to service its dealers. To secure these credit purchases, the appliances were delivered to a warehouse in the Twin Cities metropolitan area and placed under the control of NYTCO for delivery to

T.C. in accordance with the terms of the Warehouse Plan and Security Agreement (Pl.Exs. 1 and 2). As further security for the performance and payment of all of T.C.'s "obligations and indebtedness to Fedders of whatever kind and whensoever created." T.C. granted to Fedders a security interest in specific collateral sold under the Warehouse Plan as well as a broader, general security interest in all "Fedders" appliances, accessories and replacement parts then owned or acquired thereafter by T.C. together with the proceeds thereof (Pl.Ex. 1, ¶ 6).

10. The Warehouse Plan provided that ownership of any appliances purchased by T.C. thereunder vested in T.C. Possession of the goods sold thereunder, however, was deemed to remain with Fedders (Pl.Ex. 1, ¶¶ 1 and 2).

11. Under the terms of the Warehouse Plan and Security Agreement, T.C. agreed to pay Fedders the invoice price of each appliance furnished to it when due in accordance with the terms of the invoice referable thereto, or sooner upon withdrawal of the goods from the warehouse (Pl.Ex. 1, ¶¶ 3(a) and 4(a)). In the event T.C. failed to pay the invoices when due, Fedders had the right to declare all sums owing by T.C. immediately due and payable (Pl.Ex. 1, ¶ 7).

12. A Statement of Account reflecting all sales by Fedders to T.C. under the Warehouse Plan was prepared by computer and mailed to T.C. monthly showing T.C.'s account as of the last day of each month (Pl.Ex. 5). Each invoice was identified in the Statement of Account by number, date and due date. The Statement of Account also showed the original amount of the invoice, the amount owing thereon, the amount current, the amount past due and the number of days past due. At the end of the Statement, totals were given as to the amount due, the amount current and the amounts 1–30 days, 31–60 days, 61–90 days, and over 90 days past due. As of April 30, 1975, T.C. owed $506,733.37 on its CAC Warehouse account (Pl.Ex. 5). Of that amount $326,932.15 was over 90 days in default, $17,663.30 was 61 to 90 days in default, $67,264.35 was 31 to 60 days in default, and $54,572.10 was 1 to 30 days in default (Pl.Ex. 5). In addition, as of April 30, 1975, T.C. owed a total of $68,918.47 on its three open accounts with Fedders of which a total of over $45,000.00 was in default (Pl.Ex. 6).

13. On May 5, 1975, Fedders terminated T.C.'s distributorship for cause on grounds that T.C. lacked the financial capability to continue to operate the distributorship (Pl.Ex. 7). At the time this action was commenced on June 30, 1975, Fedders claimed an amount due on its Warehouse Plan account of $491,337.18 and an amount due on its open accounts of $68,918.47 (Compl. ¶ IV). In their answer, defendants admitted these amounts as due on the named accounts (Ans. ¶ III).

[THE FFC CLAIM]

14. On or about March 21, 1975, T.C. entered into a security agreement with FFC to secure the payment, performance and observance of all indebtedness, obligations and liabilities of any kind of T.C. to FFC, then existing or thereafter arising. The security agreement granted to FFC a continuing security interest in collateral consisting of, *inter alia,* all of T.C.'s then owned or thereafter acquired inventory, wherever located, related accessories and parts, and the proceeds thereof (Compl. ¶ 1, admitted in Ans. ¶ II). In addition, T.C. agreed to compensate FFC in an amount not less than fifteen percent of any outstanding indebtedness for attorney's fees incurred in attempting to collect the obligations of T.C. to FFC or to enforce the security agreement (Pl.Ex. 30, ¶ 5).

15. On or about May 11, 1974, plaintiff loaned defendant the sum of $148,355.90 evidenced by a demand promissory note dated May 1, 1974 (Pl.Ex. 31). FFC loaned T.C. a further sum of $9,777.45 on or about April 16, 1975, evidenced by a demand promissory note of that date (Pl.Ex. 32). Both notes provided for interest at the minimum rate of nine percent per annum and for reasonable costs of collection including reasonable attorney's fees based on the amount then due.

16. As of January 20, 1976, the date this action was commenced, there remained due and owing to Fedders on the loans evidenced by the notes a combined unpaid principal balance in the amount of $79,-863.80, plus interest thereon (Compl. ¶ 4, admitted in Ans. ¶ II).

[RECOVERY OF THE COLLATERAL]

17. On May 5, 1975, when T.C.'s distributorship was terminated, all of its inventory, including appliances and parts and accessories, was located at its office and warehouse facilities in Lakeville, Minnesota, with the exception of a few appliances located at the Space Center bonded warehouse (Pl.Exs. 8 and 10). The appliance collateral was being held under the control of NYTCO and Space Center for the benefit of Fedders and FFC.

18. On or about May 14, 1975, Fedders caused George Kyle, William Murphy, David Munro, Stan Iracki and others to come to the Twin Cities area and to take physical possession of the T.C. appliance inventory from NYTCO and Space Center. Mr. Kyle was the Fedders Manager of Branch Operations (See Def.Ex. F). Messrs. Murphy, Iracki and Munro were employed by the Fedders Central Distributing, Inc. (Fedders Central), a Fedders wholly-owned subsidiary branch distributor operating out of Milwaukee (West Allis), Wisconsin and Chicago (Bensenville), Illinois (Def.Ex. B and Pl.Ex. 11). Mr. Murphy was the RAC sales representative for Fedders Central in the Twin Cities area. Mr. Iracki was responsible for CAC distribution for Fedders Central and Mr. Munro was an accountant for Fedders Central.

19. The procedure established by Mr. Kyle for taking control of the inventory essentially involved a field transfer of the goods from T.C.'s Lakeville warehouse to a warehouse located in Minneapolis, Minnesota, and owned by the Murphy Warehouse Company, such transfer to be for the account of Fedders Central. According to testimony of Mr. Cameron, in conjunction with a normal field transfer from one distributor to another, credit memos were typically issued by Fedders and sent to the transferring distributor crediting that distributor with the collateral at the distributor's cost thereof. Under the unusual circumstances surrounding the instant transfer, however, involving the termination of a distributor and foreclosure on collateral, the field transfer was handled on the Fedders' books in an entirely different fashion. While credit memos were run off to clear the books of the T.C. accounts, the credit memos were not sent to T.C., nor was Fedders Central, the distributor to which the inventory was transferred, billed for the collateral. Instead, the evidence suggests that Fedders only intended by the transfer to have Fedders Central take possession of the inventory until it could be sold by Fedders at public auction.

20. Pursuant to Mr. Kyle's written instructions (Def.Ex. F), 33 truckloads of appliances were loaded and transferred from NYTCO's possession to the Murphy Warehouse by Murphy Warehouse Company employees on May 15 through May 17, 1975. Mr. William Murphy of Fedders Central (no connection to the Murphy Warehouse Company) was responsible for carrying out the taking of possession of the inventory. Mr. Iracki testified that his function was primarily to identify and evaluate the inventory and that Mr. Munro's responsibility was to count the inventory.

21. Thomas Storms, vice president in charge of operations for Murphy Warehouse Company, personally received, inspected and checked in each of the 33 truckloads received from the Lakeville location. Murphy Warehouse Company's records of receipt for each of the truckloads included a copy of the warehouse receipt issued by Murphy Warehouse, Mr. Storms' tally sheet recording the identity of the goods received, the number of each specific model of goods received, the condition of the goods received, and a bill of lading accompanying the goods (Pl.Ex. 8). Mr. Storms testified that the bills of lading would have been prepared at Lakeville as the goods were loaded on the trucks. The tally sheets were prepared by him on receiving the goods at

Murphy Warehouse and the warehouse receipts were prepared from his tally sheet. The warehouse receipts show the same information as the tally sheet including indication as to the number of items received in a damaged condition. The original of the warehouse receipt was sent to Fedders Central for their records and information in accordance with Mr. Kyle's instructions (See Pl.Ex. 8 and Def.Ex. F).

22. The inventory received by Murphy Warehouse from the Lakeville location and from Space Center were given account number 114 in the name of Fedders Central in accordance with Mr. Kyle's instructions (Def.Ex. F). This account number was separate from the numbers assigned to two other Fedders Central accounts. Of the inventory received by Murphy Warehouse, 4,052 units were recorded as available which, according to the testimony of Mr. Storms, indicated that neither the units nor the cartons were damaged. Four hundred eighty-nine (489) of the units received were damaged or had damaged cartons (Pl.Ex. 9). Murphy Warehouse issued its statement for expenses incurred in transporting and storing the T.C. inventory to Fedders Central. The total cost of retaking, storing, preparing for sale and selling the repossessed T.C. collateral was shown at trial to be $11,559.00.

23. In addition to the appliance inventory in NYTCO's possession, Fedders sought to obtain possession of the parts and accessories collateral which was in the control of T.C. On May 20, 1975, Fedders commenced a replevin action in the State District Court of Dakota County. On an Order to Show Cause, a hearing was held on May 27, 1975, at 8:30 a. m., in Hastings, Minnesota (Pl.Ex. 21). Counsel for T.C., Dennis J. Holisak, appeared at the hearing on behalf of T.C. to oppose the replevin action. After the hearing, the State District Court issued its Order granting replevin (Pl.Ex. 21). Fedders thereafter obtained possession of the parts and accessories collateral through a sheriff's levy pursuant to Minn.Stat. § 565.01, et seq.

## [CONDUCT OF THE FORECLOSURE SALES]

24. Plaintiffs conducted three separate foreclosure sales to liquidate the T.C. inventory collateral. The appliances which constituted the specific collateral under the Warehouse Plan and Security Agreement were sold to satisfy T.C.'s CAC Warehouse Account on May 30, 1975, at the Murphy Warehouse. The parts and accessories collateral which had been replevied was sold to satisfy the balance of T.C.'s CAC Open Account with Fedders on June 5, 1975, at the Dey Appliance Company's place of business. The appliance collateral in which FFC held a specific security interest was sold to satisfy the unpaid portion of FFC's demand notes on June 16, 1975, at the Murphy Warehouse.

25. On May 23, 1975, Richard Taylor, T.C.'s president, was served personally with notice of the May 30, 1975 appliance sale (Pl.Ex. 19). In addition, the Notice of Sale was served by United States mail upon the American National Bank and Trust Company (American National), a party claiming a security interest in the collateral (Pl.Ex. 19). The Notice of the May 30, 1975 sale was published in the Sunday morning *Minneapolis Tribune* of May 25, 1975, in the *St. Paul Dispatch* and *Pioneer Press* on May 26, 1975, and in the Friday morning *Minneapolis Tribune* on May 30, 1975, and the *St. Paul Dispatch* and *Pioneer Press* newspapers of that date (Pl.Exs. 15 and 18). The Notice of Foreclosure Sale was also posted by the Hennepin County Sheriff's office at the most public places in the City of Minneapolis (Pl.Ex. 19).

28. The Notice provided that a public auction sale pursuant to Minn.Stat. § 336.9–504 would be conducted at ten o'clock a. m. on May 30, 1975, at the premises known as the Murphy Warehouse Company, 701–24th Avenue Southeast, Minneapolis, Minnesota 55414. The Notice also indicated that, at the auction, Fedders Corporation would offer for sale 33 truckloads of new heating and air conditioning equipment, including furnaces, central air conditioning units and rooftop air conditioning units for commer-

cial buildings and dwelling units. The Notice stated that the goods could be examined and inspected prior to the sale at the place of sale during the regular business hours of Murphy Warehouse Company (Pl. Exs. 18 and 19).

27. The sale was conducted as scheduled on May 30, 1975. The persons attending the sale were Charles Faegre and James Rubenstein, counsel for Fedders, and William Murphy, representative of Fedders, one other potential bidder, and the Deputy Sheriff who conducted the sale. No one attended the sale on behalf of either T.C. or American National.

28. Prior to the sale, persons in attendance viewed the collateral which had been stored in a certain area in the Murphy Warehouse building. The Sheriff's Deputy informed these individuals that the bids on individual units would be taken first and then any bids on the entire inventory would be received. Unless the individual bids as a total were greater than the bulk bid, the bulk bidder was to be awarded the sale. The Sheriff's Deputy then called for bids and Mr. Faegre bid on behalf of Fedders for all the collateral the amount of $375,000.00. There were no other bids.

29. At trial, Mr. Muscarnera, in-house counsel for Fedders, testified as to how Fedders and FFC arrived at their bid in prices. With respect to the May 30, 1975 sale, he testified that Fedders' personnel determined that T.C.'s cost of the Fedders appliance collateral that had been repossessed under the Warehouse Plan was approximately $500,000.00. In determining that the bid in price for that collateral should be $375,000.00, Mr. Muscarnera testified that he took into account the fact that Fedders' factory costs for the manufacture of appliances was about two-thirds of distributor's price. He also considered the fact that extra expenses would be incurred by Fedders in connection with the inventory in the nature of storage, handling, sales and promotional expenses. Finally, he took into account the fact that distributor's prices included an eight percent (8%) dealer benefit for trips, advertising and other dealer sales promotions.

30. In addition to Mr. Muscarnera, Mr. Iracki, Vice President and General Manager of Merco Corporation, an independent distributor of Fedders' products, testified. He indicated that he was familiar with the appliance collateral sold and that, based upon his fifteen years of experience as a Fedders distributor, he estimated that the highest price one could reasonably expect to obtain on a distressed public sale of Fedders appliances would be between thirty and forty percent of distributor's cost. He testified that a purchasing distributor would have freight cost, would not receive promotional benefits amounting to approximately seven percent of the distributor's price, and would have a risk in buying at a distress sale because of an inability to determine accurately the condition of the goods without opening each carton and inspecting each and every unit.

31. Mr. Iracki also testified that as an alternative to a public auction, Fedders might have attempted to dispose of the goods through private sales to individual distributors across the country. He indicated, however, that while Fedders might have realized a higher percentage (perhaps sixty to seventy percent) of the distributor's costs by this method of disposal, the entire disposal operation would in all likelihood have taken several years to complete during which time Fedders would have incurred sales expenses, warehouse expenses, carrying charges and freight expenses.

32. There was testimony at trial to the effect that prior to the May 30, 1975, sale, some of the inventory repossessed from T.C. was removed from the Murphy Warehouse and shipped to dealers or other distributors. There was further testimony not all of this inventory was replaced prior to the foreclosure sale (See Def.Ex. G, Pl.Exs. 23–26). Mr. Cameron testified that some of the goods were shipped at the express request of T.C. because the dealer involved had been promised the goods by T.C. and needed them badly (Pl.Exs. 25 and 26). The total dollar amount figured at distributor's cost of the goods shipped out and not replaced

according to Mr. Cameron's testimony was $30,134.90 (Def.Exs. M and K).[2] Mr. Muscarnera testified, however, that when he computed the Fedders bid-in price for the appliance collateral sale held on May 30, 1975, he was unaware that any of the goods had been shipped out. The amount of the Fedders' bid was thus based on the assumption that the entire inventory was present.

33. In connection with the May 30, 1975 sale, a Sheriff's UCC Certificate of Sale was prepared to which was attached the inventory list of the goods sold as well as affidavits of service and the posting of Notice (Pl.Ex. 19).

34. Notice of the June 5, 1975 parts and accessories sale was served upon T.C. by leaving a copy of the Notice of Sale with Richard Taylor as president of T.C. on May 28, 1975 (Pl.Ex. 22). Additionally a copy of the Notice was served by United States mail upon American National, the subordinate secured party (Pl.Ex. 22). The Notice was published in the four major Twin Cities metropolitan newspapers on a total of eleven occasions. It was published in the *Minneapolis Tribune* on May 30, June 1 and June 2, 1975. It was published in the *Minneapolis Star* on May 30 and June 2, 1975. It was published in the *St. Paul Dispatch* and *Pioneer Press* newspapers on May 31, June 1 and June 2, 1975 (Pl.Exs. 15 and 16). In addition, the Notice was posted by the Sheriff in the three most public places in Ramsey County as indicated in the Affidavit of the Deputy Sheriff (Pl.Ex. 22).

35. The Notice stated that Fedders would conduct the sale pursuant to Minn. Stat. § 336.9–504 on the 5th day of June 1975, at ten o'clock a. m. at the premises known as Dey Appliance Parts Company, 325 North Snelling Avenue, St. Paul, Minnesota 55104. The Notice provided that Fedders would publicly offer for sale various parts and accessories listed in the Notice of Sale. The Notice also provided that prior to the date of sale, the goods could be inspected at the place of sale during the regular business hours of Dey Appliance Parts Company (Pl.Ex. 22).

36. The Sheriff's Report of Sale indicates that the sale was conducted pursuant to and at the time and place specified in the Notice of Sale (Pl.Ex. 22). The Sheriff certified that he attended the sale and acted as auctioneer and, with the property in full view, offered the same for sale to the highest bidder. The goods were sold to Fedders Corporation for a sum of $39,306.00 (Pl.Ex. 22). There was no evidence anyone attended the sale on behalf of T.C. or American National. A detailed list of the goods sold at the sale indicated that the goods were the same as those identified in the inventory list attached to the Dakota County Sheriff's return in replevin (Pl.Ex. 21).

37. In connection with the parts and accessories collateral, Mr. Muscarnera, Fedders' in-house counsel, testified that he determined that the cost to T.C. of that collateral had been approximately $40,000. He then formulated the Fedders bid in price of $39,000.00.

38. Notice of the June 16, 1975 FFC sale was served upon T.C. at the residence of Richard Taylor by leaving a copy with his wife on June 9, 1975. T.C. admitted due notice of the public sale of the collateral repossessed to satisfy the T.C. indebtedness to FFC (Compl. ¶ 6, admitted in Ans. ¶ II). Notice of the sale was also served by United States mail on American National as a party holding a security interest in the collateral upon which FFC was foreclosing (Pl.Ex. 20). Notice of the June 16, 1975 sale was published in the *Minneapolis Tribune* on June 11 and June 12, 1975, and in the *Minneapolis Star* on June 11, 1975. Notice was also published in both the *St. Paul Dispatch* and *Pioneer Press* newspapers on June 11, 12 and 13, 1975 (Pl.Exs. 15 and 17). As in the other sales, the Notice of Sale was posted at the three most public places in Hennepin County (Pl.Ex. 20).

---

2. While other goods were apparently shipped out of Account # 114, the account reflecting the goods repossessed from T.C., prior to the May 30, 1975 sale (See Def.Ex. L), it appears that at least some of these goods were replaced by a shipment into the account from Fedders Central in West Allis, Wisconsin (See Pl.Ex. 11).

39. · The Notice of Sale provided that the sale was to be held on June 16, 1975, at two o'clock p. m. at the Murphy Warehouse Company in Minneapolis. According to the Notice, at the time FFC 'would publicly offer for sale the collateral described therein pursuant to Minn.Stat. § 336.9–504. The Notice also provided that the property to be sold could be examined prior to the sale at the place of sale during regular business hours.

40. Prior to the sale, Murphy Warehouse Company was given a list of the collateral to be sold at the June 16, 1975 sale and was asked to segregate it and get it ready for auction (Pl.Ex. 12). Mr. Storms, who was in charge of segregating the goods for the sale, indicated he was not able to find all of the goods but did find approximately 95% of the items and segregated them before the sale.

41. The sale was conducted as scheduled on June 16, 1975. The Murphy Warehouse maintained a sign-in sheet for the sale which indicated that approximately one dozen persons attended. The registration sheet indicated that several persons from Johnny's T.V. and others came early to inspect the goods. Bids were received from Mr. Storms, a representative of Johnny's T.V. and one other person, in addition to the bid made by William Murphy on behalf of FFC. The FFC bid, as accepted, was in the amount of $50,000.00. According to testimony at trial, the next highest bid was approximately $20,000.00. Mr. Muscarnera testified that in formulating the FFC bid, he determined that the distributor's price of the collateral sold was approximately $77,-000.00 to $78,000.00. There was no evidence that anyone from either T.C. or American National attended the June 16, 1975 sale.

42. The evidence shows that all invoices and the "Request for Debit or Credit" papers pertaining to the merchandise transferred from T.C.'s warehouse and issued to Fedders Central were created on or after June 16, 1975 (See Def.Exs. A and B). According to the evidence, Fedders billed Fedders Central in July 1975 for the collateral transferred from T.C.'s warehouse to the Murphy Warehouse (Def.Ex. B).

## [ACCOUNTS RECEIVABLE]

43. In addition to the collateral disposed of through the three foreclosure sales, Fedders took possession and apparently undertook collection of accounts receivable that were outstanding and uncollected at the time of T.C.'s termination as a Fedders distributor. Examination of T.C.'s records in the form of a ledger tray introduced at trial (Def.Ex. N) indicates that the accounts receivable totaled $31,471.23. Fedders is unable to determine or account for the collection or realization of these accounts receivable.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and subject matter jurisdiction over the two actions before it pursuant to 28 U.S.C. § 1332.

2. Plaintiffs seek through their actions deficiency judgments against T.C. Distributors, Inc., and T.C.'s guarantors, the Taylors and the Camerons. The basic elements of plaintiffs' claims have been admitted, stipulated to or proven without dispute. The fact of the underlying indebtedness and the amount of the indebtedness have been admitted. The existence of a security interest has also been admitted. The fact of the default on the indebtedness has been proven. The facts of the foreclosure sales and the amounts realized upon the sales have been admitted. Finally, the parties have stipulated to the rates for attorney's fees with respect to both the Fedders and the FFC claims, as well as the rate of interest with respect to the FFC claim. The affirmative defenses asserted by defendants thus present the only issues for resolution by this Court.

3. In the Fedders case, defendants asserted two affirmative defenses. The first was that Fedders on May 5, 1975, breached the Franchise Agreement and in violation of the Minnesota Franchise Act appropriated defendants' "inventory, office

personnel, dealers, telephone and business goodwill." No evidence was presented at trial by defendants in support of this defense, however, nor was any evidence presented as to the damages which T.C. or the individual defendants may have suffered in connection with this defense. Thus the Court considers this defense to have been waived.

■ 4. The second affirmative defense raised by defendants in the Fedders action was that Fedders' actions "in obtaining possession of the appliances, parts and accessories and the amount thereafter bid in at sale was (sic) commercially unreasonable." This defense was stated more broadly in the FFC action as "the repossession of the aforementioned collateral and the subsequent sale to plaintiff was commercially unreasonable."

5. Minnesota Statutes § 336.9–503 [3] provides:

"Unless otherwise agreed, a secured party has on default the right to take possession of the collateral. In taking possession, a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action."

The evidence adduced at trial established that Fedders and FFC took possession of the appliance collateral from the NYTCO and Space Center bonded warehouses without judicial process. There was no evidence of any breach of the peace in connection with the taking of physical possession of that property. Under the Warehouse Plan and Security Agreement between Fedders and T.C., moreover, Fedders was deemed to have possession of the appliance collateral sold pursuant to the Warehouse Plan and held by NYTCO.

With respect to the parts and accessories collateral, Fedders was forced to resort to judicial action when T.C. refused to voluntarily turn over possession of that collateral. The evidence shows that Fedders proceeded to replevy this collateral in strict accordance with Minn.Stat. § 336.9–503.

The Court thus finds that in every respect plaintiffs' repossession of the collateral in question was proper under the Uniform Commercial Code.

6. The remaining arguments advanced in support of defendants' claim that plaintiffs are not entitled to a deficiency judgment derive largely from defendants' assertion that plaintiffs' disposition of the collateral repossessed from T.C. was made in a commercially unreasonable manner in contravention of Minn.Stat. § 336.9–504. Minn.Stat. § 336.9–504 provides in pertinent part:

"Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. . . . [R]easonable notification of the time and place of any public sale shall be sent by the secured party to the debtor and except in the case of consumer goods to any other person who has security interest in the collateral and who has duly filed a Financing Statement indexed in the name of the Debtor in this state or who is known by the secured party to have security interest in the collateral. The secured party may buy at any public sale . . . .."

■ 7. There is a split of authority on the question of which party has the burden of proof in establishing the commercial reasonableness or unreasonableness of the disposition of collateral when a deficiency judgment is sought. *Compare, e. g., Kobuk Engineering & Contracting Services, Inc. v. Superior Tank & Construction Co., Alaska, Inc.*, 568 P.2d 1007 (Alaska 1977); *Beneficial Finance Co. of Blackhawk County v. Reed*, 212 N.W.2d 454 (Iowa 1973); *Vic Hansen & Sons, Inc. v. Crolley*, 57 Wisc.2d 106, 203 N.W.2d 728 (1973), *with Pruske v. National Bank of Commerce of San Antonio*, 533 S.W.2d 931, 18 UCC Rep.Serv. 1325 (Tex.Civ.App.1976); *Fryer v. Willis Drilling*

---

3. That Minnesota law applies in these cases is undisputed. *See* Minn.Stat. § 336.1–105(1).

*Co. v. Oil Well, Division of United States Steel Corp.*, 472 S.W.2d 857, 9 UCC Rep. Serv. 1135 (Tex.Civ.App.1971). *See generally* 4 Anderson, *Uniform Commercial Code*, 9–504:12.1 (1971 ed.), 1978 Cum.Supp. at 205, and cases cited therein. The Minnesota Supreme Court has not addressed this issue.[4] This Court, however, thinks the better rule would place the burden of proof on the secured party to show the commercial reasonableness of the disposition of collateral where the commercial reasonableness is challenged and the secured party seeks a deficiency judgment. The Uniform Commercial Code imposes upon the secured party a duty to dispose of repossessed collateral in a commercially reasonable manner. As a means of encouraging compliance with the Code, it makes sense to require the secured party to demonstrate fulfillment of this duty prior to recovering a deficiency judgment. Under established legal principles, the party who stands to benefit from the establishment of the affirmative of a proposition of fact essential to a cause of action generally bears the burden of proof as to that proposition. Thus, it follows logically that if the commercially reasonable disposition of collateral is treated as a condition precedent to recovery of a deficiency judgment, the burden of proof as to that proposition should fall on the secured party. *See* 59 A.L.R.3d 369 (1974).

■ 8. Assuming the secured party makes a prima facie case indicating the commercially reasonable disposition of collateral, the burden of persuasion—though not the burden of proof—shifts to the debtor to elicit specific evidence of commercial unreasonableness in order to avoid entry of the requested deficiency judgment. In the instant two cases, the Court finds that plaintiffs have made a prima facie showing that the disposition of collateral was made in a commercially reasonable manner by demonstrating that apparently reasonable procedures were followed in disposing of the collateral.

■ Plaintiffs complied with the notice requirement by giving notice to the secured parties at least seven days prior to each of the foreclosure sales.[5] Given the significant costs of storing the repossessed collateral, plaintiffs' decision to conduct the sale within seven days of issuance of notice was not inherently unreasonable. *See Sierra Financial Corp. v. Brooks Farrer Co.*, 15 Cal. App.3d 698, 93 Cal.Rptr. 422, 8 UCC Rep. Serv. 1125 (1971). Moreover, having done nothing to protect its interest in the collateral upon receipt of the notice, the Court finds that T.C. is estopped to deny the sufficiency of the notice at this late date.[6]

■ The public sales advertised by published notice were conducted in a proper and reasonable manner. Publication of notice in newspapers as was done in the instant cases has been frequently approved as the proper method of providing public notice of a foreclosure sale. *See, e. g., In Re Zsa Zsa Ltd.*, 352 F.Supp. 665, 11 UCC Rep. Serv. 1116 (S.D.N.Y.1972), aff'd 475 F.2d 1393 (2d Cir. 1973); *Sierra Financial Corp. v. Brooks Farrer Co., supra; Northern Financial Corp. v. Kesterton*, 31 Ohio App.2d 256, 287 N.E.2d 923, 11 UCC Rep.Serv. 1084 (1971). In addition, the method and man-

4. Because diversity jurisdiction is invoked in the instant case, the Court is required under well-established precedent to apply that law which the courts of the forum state would apply in adjudicating this dispute. *Klaxon v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

5. With respect to the question of notice to the guarantors, see discussion *infra*.

6. The purpose of requiring notice of an intended disposition

"is to enable the debtor to protect his interest in the property by paying the debt, interest-

ing potential purchasers in the collateral, or being present at the sale to bid on the property or have others to do so to prevent a sacrifice by a sale at less than its true value." *First National Bank & Trust Co. of Enid v. Halston*, 20 UCC Rep.Serv. 1124 (Okla.S.Ct. 1976).

There is no evidence in the case before this Court that prior to the foreclosure sales, T.C. objected to the manner or method of sale, tried to restrain the sale by Court Order, or made a serious effort to line up potential purchasers for the collateral.

ner of plaintiffs' sales appear to have been commercially reasonable under the circumstances. Public auction of goods in bulk quantity is a proper means of liquidating a large amount of distressed merchandise. Moreover, the amounts bid in by plaintiffs and ultimately accepted at the sales were not unreasonable in amount and were apparently calculated on a fair basis. In any event, the fact that a better price might have been obtained at a different time or through a different method of sale is not sufficient in and of itself to establish that a sale was made in a commercially unreasonable manner.[7] Minn.Stat. § 336.9–507(2). In summary, it appears that plaintiffs acted reasonably and in good faith in disposing of the T.C. collateral. The burden of bringing forth specific evidence to challenge the commercial reasonableness of the collateral disposition thus shifts to defendants.

9. At trial, defendants introduced evidence which purported to show that the public sales of the T.C. collateral were a sham and that the actual disposition occurred at the time of the field transfer of the collateral from the NYTCO Warehouse to the Fedders Central account at the Murphy Warehouse. According to defendants the "public sales" were used to manufacture most of the deficiency amounts now claimed by Fedders and FFC. Defendants maintain specifically that at the time of the field transfer, Fedders received a commitment from Fedders Central to pay $577,000.00 for the collateral, as evidenced by the credit memorandum issued by Fedders to clear the T.C. accounts. Defendants contend that they are entitled to a credit in this amount, less reasonable expenses of disposition and sale, against the total indebtedness of $585,000.00 claimed by plaintiffs.

To buttress their argument, defendants assert that Fedders Central treated the collateral as its own prior to the public sales by shipping part of the collateral in the amount of $8,987.00 to a Fedders distributor in San Antonio, Texas, (Def.Ex. G) and additional collateral to T.C.'s former dealers (Def.Ex. L). In addition, there was evidence that a shipment of goods from Fedders Central in West Allis, Wisconsin, was commingled with the T.C. collateral stored in the Murphy Warehouse. Finally, defendants note that Murphy Warehouse billed Fedders Central, rather than Fedders or FFC, for the transportation and storage expense associated with the T.C. collateral and that Fedders Central paid the bill. Each of these actions, according to defendants, evidences an assertion of dominion and control by Fedders Central consistent with ownership of the collateral.

Having examined the evidence with care, the Court finds defendants' argument unpersuasive. There is no evidence that Fedders intended to sell the T.C. collateral to Fedders Central at the time the field transfer occurred. Instead the evidence establishes that in contrast to the procedure normally used in connection with field transfers, in the instant case, Fedders did not credit T.C. with the distributor's cost of collateral upon transfer and, further, did not bill Fedders Central for the collateral received. Indeed, Fedders Central was not billed for the collateral until July 1974 after the last of the three foreclosure sales. The circumstances surrounding the repossession of the T.C. collateral suggest that in taking possession of the collateral, Fedders Central

---

7. In *Sierra Financial Corp. v. Brooks Farrer Co., supra,* the secured party bid $500.00 to obtain property with a fair market value of $27,616. The Court held that this price differential was not sufficient to invalidate the sale where it was shown that the debtors and their attorneys were notified and could have attended the sale, publication of the sale was made, no fraud or wrongdoing on the part of the secured party was alleged and the merchandise was distressed. See also *In Re Zsa Zsa Ltd., supra,* in which collateral with a retail value of $3.5 million, a wholesale value of $1.5 million and a manufacturer's cost of $500,000.00 was sold at public sale for $300,000.00. In upholding the sale, the Court noted that adequate notice of the sale had been published and all other aspects of the sale were undertaken in a reasonable manner. The Court pointed out that " . . . [t]he code requires reasonableness; it does not make the secured party an insurer of a hypothetical expected return." 352 F.Supp. at 672.

was acting at the direction and as the agent of Fedders and FFC.

The Court is not persuaded that a contrary conclusion is necessarily mandated by the evidence of sales by Fedders Central from the T.C. collateral prior to the first foreclosure sale. Mr. Muscarnera, Fedders' in-house counsel, testified that these sales were made without the knowledge of Fedders. Thus they provide no indication of Fedders' intent to transfer ownership prior to sale. Nor does the Court find conclusive on the issue of transfer of ownership evidence that Fedders Central commingled the T.C. collateral with other inventory shipped in from its West Allis location. At the time of the field transfer, records were made identifying the model number and kind of inventory repossessed from T.C. These records provided a basis for later identifying and segregating the T.C. collateral prior to sale. Thus there was no need to keep the inventory separate. Moreover, the Court sees no reason to dispute plaintiffs' assertion that goods of a given model were fungible. Indeed, they were so treated in the invoices and warehouse receipts introduced into evidence at trial. Therefore, Fedders itself breached no obligation to the debtors when the collateral at the Murphy Warehouse was commingled with the West Allis shipment. Minn.Stat. § 336.9–207(2)(d). Finally, the Court does not find the submission to any payment by Fedders Central of the storage and transportation bill inconsistent with its conclusion that Fedders Central acted as Fedders' agent in taking physical possession of the T.C. collateral. Under general principles of agency law, an agent may enter into contracts and may incur expenses on behalf of its principal.

■ 10. Defendants assert in the alternative that if disposal of all of the collateral was not made by Fedders to Fedders Central before the public sales, defendants are at least entitled to be credited with the proceeds derived from the sale and shipment of goods out of the T.C. inventory by Fedders Central prior to the first foreclosure sale. The Court agrees with defendants that the right to a deficiency judgment is fixed upon the initial disposition of collateral by a secured party. The secured party cannot pick and choose as to which of several dispositions he wishes to use to compute the deficiency amount to the detriment of the debtor. *See Elster's Sales v. El Bodrero Hotel, Inc.*, 250 Cal.App.2d 258, 58 Cal.Rptr. 492 (1967).

In the two cases here presented, however, the Court finds that only a single disposition by the secured party took place—that which occurred as a result of the three foreclosure sales.[8] Prior to the time of the first such sale, some of the T.C. collateral was concededly sold, but at least part of this collateral sold was apparently replaced prior to the first sale. Under Minn.Stat. § 336.9–207(2)(d) a secured party is allowed to commingle fungible goods. To the extent the goods sold prior to sale were replaced with goods of the same model, then, defendants suffered no detriment.

■ There was evidence that at the time of the May 30, 1975 foreclosure sale approximately $31,000 in goods at distributor's cost had been shipped out of the T.C.

---

8. While the *Elster's Sales* case stands for the general proposition that a defaulting debtor's liability for any deficiency is fixed when the creditor enters into a contract for sale of the collateral, the facts of *Elster's Sales* are significantly distinguishable from those at issue before this Court. In *Elster's Sales*, the secured party repossessed and resold under a conditional sales contract certain goods. Almost a year later, the purchasing party defaulted on the conditional sales contract and the secured party again repossessed the goods and resold them. The Court refused to allow the secured party to fix the original debtor's liability by reference to the second sale, holding that the defaulting debtor was entitled to have his obligation fixed and determined within a reasonable time. 58 Cal.Rptr. at 494. According to the Court, the second sale was too remote in time to allow the secured party to fix its right to a deficiency by reference thereto.

In the instant case, by contrast, defendants were informed from the start that the repossessed goods would be sold at public sale, the first such sale being held within two weeks of the repossession. There was no delay in fixing the debtor's liability to the secured party and no confusion as to the reference point to be used in determining any deficiency.

inventory and not replaced. Here again, however, no prejudice appears to have resulted to defendants since Mr. Muscarnera testified that in computing Fedders' bid in price for the collateral he assumed that the entire inventory was present and bid accordingly. Had anyone bid higher than Fedders at the sale, the missing goods could presumably have been replaced with units of the same model number. Thus, since defendants suffered no apparent loss as a result of the absence of a small portion of the inventory at the time of the May 30, 1975 foreclosure sale, the Court sees no need to adjust any deficiency judgment which may ultimately be awarded.

11. Turning to a different argument, defendants contend that neither Fedders nor FFC is entitled to allocate any portion of the proceeds realized on the disposition of the collateral to cover expenses of retaking, holding, preparing for sale or selling the collateral since these expenses were incurred by, and charged to, Fedders Central, a separate corporate entity. The Uniform Commercial Code provides that the proceeds of any disposition of collateral are first to be applied to cover:

> "[t]he reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like, and to the extent provided for in the agreement and not prohibited by law, the reasonable attorney's fees and legal expenses incurred by the secured parties; . . .." Minn. Stat. § 336.9–504(1)(a).

At trial it was proven without dispute that the reasonable expenses of retaking, holding, preparing for sale and selling the collateral in which Fedders and FFC held a security interest was $11,559.00. The evidence also shows that in retaking the T.C.

collateral Fedders Central was acting as the agent of Fedders and FFC. The instructions for the transfer of the T.C. collateral to Murphy Warehouse were issued by George Kyle, Manager of Branch Operations of Fedders Corporation (Def.Ex. F). Fedders Central performed the functions specified in these instructions under the supervision and control of Fedders and FFC. Because any expenses incurred by Fedders Central were incurred in its capacity as agent for Fedders and FCC, and because under established agency law, the principal is liable on all contracts made by an agent on behalf of the principal, see 1A Dunn.Minn.Dig., Agency, §§ 209, 210, Fedders and FFC are entitled to deduct the cost of retaking, holding, and reselling the collateral from the proceeds of the disposition.

12. Defendants Gertrude F. Taylor, Edward R. Cameron and Judith Cameron next assert that as to them the disposition of collateral was undertaken in a commercially unreasonable manner because, as guarantors, they were entitled to, but did not receive, separate notice of the foreclosure sales pursuant to Minn.Stat. § 336.9–504(3). Defendants did not specifically plead this defense in the Fedders action[9] nor was there any indication given prior to or during the trial that defendants intended to rely on the defense. Under the Federal Rules of Civil Procedure, matters constituting an avoidance or affirmative defense are to be specifically stated. Fed.R.Civ.P. 8(c). Generally, a failure to plead an affirmative defense results in the waiver of that defense and its exclusion from the case.[10] See 5 Wright and Miller, *Federal Practice and Procedure: Civil*, § 1278 at 339 (1969 ed.).

---

9. In the FFC action, defendant T.C. raised generally in its pleadings the defense of commercial unreasonableness, which might be considered to subsume the lack of proper notice defense. In the Fedders action, however, defendant guarantors alleged only that Fedders' actions in repossessing the collateral and "the amount thereafter bid in at sale [were] commercially unreasonable."

10. If evidence relating to an unpleaded defense is introduced without objection at trial, Rule 15(b) of the Federal Rules of Civil Procedure requires that the pleadings be treated as if they had actually raised the issue. There is no evidence in the instant case, however, that the issue here sought to be raised was tried by the "express or implied consent" of the parties within the meaning of Rule 15(b).

■ Although the waiver rule may appear harsh, the Court believes that the rule is appropriately applied in the instant case given the potential prejudice to plaintiffs of allowing defendants to raise their unanticipated defense at this late date. The drafters of the Uniform Commercial Code intended to do away with rigid rules of law designed to govern in all cases in favor of more fluid guidelines which allow a functional, case by case analysis. The purpose of the notice requirement contained in Minn.Stat. § 336.9-504(3) is to enable the debtor to protect his interest by paying the debt, finding a buyer, or being present at the sale to bid on the property. If it were shown that the three defendant guarantors knew of the foreclosure sales in the instant case through communications with defendant Richard Taylor or otherwise, then the purpose of the notice requirement would have been served and defendants could have suffered no conceivable harm even though a technical violation of the Code may have occurred.[11] Moreover, if the circumstances were such that defendants knew of the sales but did nothing to protect their interests, this Court thinks defendants should be estopped to raise the no notice defense. Because plaintiffs were unaware that the three guarantors intended to raise lack of notice as a defense, they had no incentive at trial to attempt to establish actual knowledge on the part of the guarantors and might well be prejudiced by any consideration of the issue at this time. Therefore, this Court considers defendant guarantors to have waived the defense of lack of notice by failure to affirmatively plead and prove it.

13. Defendants' final argument pertains to Fedders' total failure to account for the disposal or collection of T.C.'s accounts receivable. Defendants argue that the entire disposition of collateral by the secured party should be viewed as one transaction and that every aspect of the transaction must be in accord with the requirements of the Uniform Commercial Code. *DeLay First National Bank & Trust Co. v. Jacobson Appliance Co.*, 196 Neb. 398, 243 N.W.2d 745 (1976). If the secured party is shown to have violated the Code provisions with respect to the disposition of any part of the collateral, defendants contend that the secured party should lose its right to recover any deficiency judgment. Thus, in connection with the Fedders action, because Fedders failed to establish that it disposed of the accounts receivable in a commercially reasonable manner, defendants submit that Fedders should be deprived of any deficiency judgment.

■ At the outset, plaintiffs contest the right of defendants to raise the accounts receivable issue on grounds that the issue was not raised by the pleadings, "the amount of T.C.'s indebtedness to Fedders having been admitted by defendants in their Answer which was served on Fedders' counsel on or about June 20, 1976." (Plaintiffs' Trial Memorandum at 38). The Court rejects plaintiffs' contention on two grounds. First, in admitting T.C.'s indebtedness to Fedders, the Court does not believe that defendants in any way waived their right to have any proceeds from the collection or disposition of the accounts receivable applied to reduce the amount of

---

11. It is not at all settled that guarantors are "debtors" within the meaning of § 9–504(3) of the Uniform Commercial Code and thus entitled to notice of a foreclosure sale. A majority of the decisions from other jurisdictions appear to hold that a guarantor is a "debtor" under § 9–504(3) of the Code. *See, e. g., Commercial Discount Corp. v. Bayer,* 57 Ill.App.3d 295, 14 Ill.Dec. 647, 372 N.E.2d 926, 23 UCC Rep.Serv. 1376 (1978); *Chase Manhatten Bank, N. A. v. Natarelli,* 93 Misc.2d 78, 401 N.Y.S.2d 404, 23 UCC Rep.Serv. 539 (1977); *Zions First Nation-* al Bank v. Hurst, 570 P.2d 1031, 22 UCC Rep. Serv. 1071 (Utah 1977); *Barnett v. Barnett Bank of Jacksonville,* 345 So.2d 804 (Fla.App. 1977). There are, however, decisions holding that a guarantor is not a "debtor" under § 9–504(3) and the secured party is not required to send notice to him. *See, e. g., First National Park Bank v. Johnson,* 553 F.2d 599 (9th Cir. 1977); *Brinson v. Commercial Bank,* 138 Ga.App. 177, 225 S.E.2d 701, 18 UCC Rep. Serv. 1337 (1976). The Minnesota Supreme Court has not addressed this issue.

the indebtedness. Second, although plaintiffs objected at trial to the introduction into evidence of records pertaining to the accounts receivable on grounds of relevancy, the Court does not recall a specific objection by plaintiffs to the evidence on grounds that it went beyond the scope of the pleadings. In any event, Rule 15(b) of the Federal Rules of Civil Procedure permits a court to defeat such an objection by allowing an amendment to the pleadings where to do so will facilitate the presentation of the merits of the action and where the objecting party fails to establish prejudice to its case by the admission of the contested evidence.

In this Court's opinion, consideration of the accounts receivable question is essential to a proper resolution of the instant dispute. The tenor of the Uniform Commercial Code mandates that the entire disposition of collateral be regarded as a single transaction subject to the commercial reasonableness requirement.[12] In the instant case there is no question that the accounts receivable were part of the collateral covered by the security agreement between T.C. and Fedders. Moreover, plaintiffs can hardly complain of prejudice if the accounts receivable issue is considered by the Court. The issue was thoroughly litigated and plaintiffs given adequate opportunity to attempt to meet defendants' evidence.

■ 14. To date Fedders has failed to locate any records pertaining to the accounts receivable. If the requirement of commercial reasonableness as applied to liquidation of accounts receivable means anything it must mean at a minimum that Fedders was obligated to account to defendants as to the final disposition of the receivables. The only real question is what consequence should attach to Fedders' failure to fulfill its obligations under the Code. The issue is one of first impression in this jurisdiction. Courts that have considered the

issue have differed as to the effect of failure to comply with § 9–504(3) of the Code. Many of the courts have held that failure to comply with the requirements of § 9–504(3) absolutely precludes recovery by a secured party of a deficiency judgment in a subsequent action against the debtor. *See. e. g., Herman Ford-Mercury, Inc. v. Betts,* 251 N.W.2d 492 (Iowa 1977); *DeLay First National Bank & Trust Co. v. Jacobson Appliance Co., supra; Camden National Bank v. St. Clair,* 309 A.2d 329, 13 UCC Rep.Serv. 199 (Me.1973); *Atlas Thrift Co. v. Horan,* 27 Cal.App.3d 999, 104 Cal.Rptr. 315, 11 UCC Rep.Serv. 417 (1972). Other courts have held that failure to satisfy § 9–504(3) creates a presumption that the collateral was worth at least the amount of the debt and shifts to the secured party the burden of rebutting this presumption. *See, e. g., United States v. Willis,* 25 UCC Rep.Serv. 1178 (D.C.Cir. 1979); *In Re U. G. M.,* 20 UCC Rep.Serv. 827 (E.D.Pa.1976); *United States v. White House Plastics,* 501 F.2d 692 (5th Cir.), *cert. denied,* 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 7 (1974); *In Re Bishop,* 482 F.2d 381 (4th Cir. 1973); *Leasing Associates, Inc. v. Slaughter & Son, Inc.,* 450 F.2d 174 (8th Cir. 1971). A third line of cases holds that the violation of § 9–504(3) does not excuse the debtor entirely from paying a deficiency but merely entitles the debtor to a setoff for any loss he can prove was sustained as a result of the Code violation. *See, e. g., Leasco Computer, Inc. v. Sheridan Industries, Inc.,* 82 Misc.2d 897, 371 N.Y.S.2d 531, 17 UCC Rep.Serv. 1404 (1975); *Grant County Tractor Co. v. Nuss,* 6 Wash.App. 866, 496 P.2d 966, 10 UCC Rep. Serv. 1104 (1972).

■ In a recent opinion, *United States v. Conrad Publishing Co.,* 589 F.2d 949, 25 UCC Rep.Serv. 857 (8th Cir. 1978), the Eighth Circuit Court of Appeals reaffirmed its support for the rebuttable presumption rule. This Court concurs with the approach

---

**12.** Section 9–502(2) of the Uniform Commercial Code specifically requires the creditor to liqui- date accounts receivable in a commercially reasonable manner.

adopted by the Court in *Conrad.* While recognizing the line of authority which would deny any recovery to a secured party who violates the provisions of § 9–504(3) of the Code, this Court believes that approach to be unduly punitive and therefore repugnant to the spirit of the Uniform Commercial Code.[13] The policy of the Code as expressed in § 1–106 is clearly to allow full recompense to an aggrieved party by liberal application of the remedies provided in the Code and to avoid the assessment of penal damages. An automatic denial of a deficiency judgment as a result of any violation of the Code requirements would amount to a rejection of that policy.

■ Where collateral has been sold in a sale that is found not to have comported with provisions of the Code, this Court believes the secured party should not be barred entirely from obtaining a deficiency judgment against the debtor but that the fair value of the collateral must be credited against the debt. To this end, the Court will indulge a presumption that the value of the collateral sold was equal to the outstanding debt, thereby placing upon the secured party the burden of proving by a fair preponderance of the evidence that the reasonable value of the collateral was something less than the outstanding debt. *See Savings Bank of New Britain v. Booze,* 34 Conn.Supp. 632, 382 A.2d 226, 23 UCC Rep. Serv. 556 (1977).

■ In the instant case, Fedders has only partially rebutted the presumption. While Fedders has shown that the fair and reasonable value of the accounts receivable at the time of T.C.'s termination was no more than $31,471.23, it has not established their precise value upon disposition or collection. Therefore, the Court considers it appropriate to assign $31,471.23 as the fair and reasonable value of the collateral at the time of repossession and to offset this amount against the deficiency judgment Fedders seeks to recover.

15. In summary, the Court finds that, with the exception of the accounts receivable, disposition of the T.C. collateral was made in a commercially reasonable manner within the bounds set by the Uniform Commercial Code. As to the accounts receivable, the Court finds that plaintiff Fedders Corporation has failed to account for their disposition, thereby contravening the requirements of Minn.Stat. § 336.9–502(2). The Court therefore concludes that plaintiff Fedders Corporation is entitled to the deficiency judgment sought, together with interest and attorney's fees related thereto, less the reasonable value of the accounts receivable (See Appendix A). Plaintiff Fedders Financial Corporation is entitled to the deficiency judgment sought, together with interest and related attorney's fees (See Appendix B).

## ORDER FOR JUDGMENT

IT IS ORDERED THAT:

1. Plaintiff Fedders Corporation be awarded a judgment against defendants Richard L. Taylor, Gertrude F. Taylor, Edward R. Cameron and Judith Cameron, jointly and severally, in the amount of $177,540.71.

2. Plaintiff Fedders Financial Corporation be awarded a judgment against defendant T.C. Distributors, Inc., in the amount of $48,161.09.

---

13. See in this regard *Clark Leasing Corp. v. White Sands Forest Products, Inc.,* 87 N.M. 451, 535 P.2d 1077, 16 UCC Rep.Serv. 1442 (1975) in which the Court stated:

"The complete denial of the deficiency smacks of the punitive and is directly contrary to Article Nine's underlying theme of commercial reasonableness. 'If the secured party has reimbursed the debtor for any loss-es incurred by improper sale, he has approximated the commercially reasonable sale. Thus, he should be allowed to receive the money which would have been due if the sale had been commercially reasonable.'" 535 P.2d at 1081–82, quoting Minetz, "May a 'Wrongdoer' Recover a Deficiency Judgment or is Section 9–507(1) a Debtor's Exclusive Remedy?", 6 *UCC L.J.* 344, 363 (1974).

## APPENDIX A

### FEDDERS' CLAIM

(A)  Appliance Collateral Deficiency

| | | |
|---|---|---|
| Amount of Indebtedness | $491,337.00 | |
| LESS:   Foreclosure Sale Price | $375,000.00 | |
| DEFICIENCY | $116,337.00 | $116,337.00 |
| Plus Interest at legal rate of 6% (Minn.Stat. § 334.01) from May 30, 1975 accrued through May 31, 1979 | | $ 27,913.37 |
| Total Principal and Interest | | $144,250.37 |
| Plus 10% Attorney's Fee (Pl. Ex. 29) (.10 x 144,250.37) | | $ 14,425.04 |
| Total | | $158,675.41 |

(B)  Parts and Accessories Collateral Deficiency

| | | |
|---|---|---|
| Amount of Indebtedness | $ 68,918.00 | |
| LESS:   Foreclosure Sale Price | $ 39,306.00 | |
| DEFICIENCY | $ 29,612.00 | $ 29,612.00 |
| Plus Interest at the legal rate of 6% from June 5, 1975 accrued through May 31, 1979 | | $ 7,082.12 |
| Total | | $ 36,694.12 |
| Plus 10% Attorney's Fee | | $ 3,669.41 |
| Total | | $ 40,363.53 |

Plus pro rata share of the $11,559.00 proven costs of retaking, holding, preparing for sale and selling the collateral (Pl. Exs. 27 and 28)

$$\frac{\$488,537.00}{\$77,656.00 + \$488,537.00} \times \$11,559.00 = \quad \$ 9,973.00$$

| | |
|---|---|
| TOTAL AMOUNT AS OF MAY 31, 1979 | $209,011.94 |
| LESS:   Reasonable Value of Accounts Receivable | $ 31,471.23 |
| TOTAL AMOUNT OF JUDGMENT | $177,540.71 |

## APPENDIX B

### FFC'S CLAIM

| | | |
|---|---|---|
| Amount of Indebtedness | $79,863.80 | |
| LESS: Foreclosure Sale Price | $50,000.00 | |
| DEFICIENCY | $29,863.00 | $29,863.00 |
| Plus Interest at rate of 9% per annum from and after June 16, 1975 through May 31, 1979 | | $10,637.95 |
| Total | | $40,500.95 |
| Plus 15% Attorney's Fee (Pl. Exs. 30, 31 and 32) | | $ 6,075.14 |
| Total | | $46,576.09 |
| Plus pro rata share of the $11,559.00 proven costs of retaking, holding, preparing for sale and selling collateral (Pl. Exs. 27 and 28) | | |

$$\frac{\$77,656.00}{\$77,656.00 + \$488,537.00} \quad x \quad \$11,559.00 \quad = \quad \$ 1,585.00$$

TOTAL AMOUNT OF JUDGMENT      $48,161.09