## CIRCUIT COURT OF FAIRFAX COUNTY

Cho et al.

v.

Lee et al.

April 19, 1982

Case No. (Law) 53815

By JUDGE HENRY H. WHITING

The following is my opinion letter following the hearing of the evidence before the Court on March 15, 1982. By agreement of all parties or their counsel previously, jury was waived and the case tried before the Court. All parties appeared in person or by counsel except Mrs. Yi, who did not have counsel at the time.

The plaintiffs (hereafter Cho, even though more than one) seek a deficiency judgment against Lee (hereafter Lee, even though more than one) arising out of Cho's foreclosure of the security after default by Lee. Lee defends on the sole ground that the sale was not conducted in a commercially reasonable manner as required by the Uniform Commercial Code. If Lee is held to be ultimately liable, he seeks indemnity against Hye Cha Yi (hereafter Yi), who assumed Lee's obligations under the security agreement when she purchased the secured property. The security was a restaurant/carry-out food business known as Wilson Pizza, located at 6621 Wilson Boulevard, Falls Church, Virginia.

### Issues

(1) Was the sale of the restaurant/carry-out food

business conducted in a commercially reasonable manner as required by Virginia Code § 8.9-504(1), (3)?

(2) If the sale was not conducted in a commercially reasonable manner, what rights, if any, does the secured party have against the debtor?

(3) If the debtor is liable, to what extent is the debtor's purchaser liable to the debtor?

## Statement and Findings of Fact

This case may be best understood by describing the series of four sales of this pizza restaurant beginning in June of 1979 and ending two years later on June 30, 1981:

(1) In June of 1979 Tzovaras sold this business to Cho for $85,000.00, Cho assuming payment of a previous note executed by Tzovaras and held by Underhill of about $26,000.00, giving Tzovaras his note of $31,000.00 and paying the balance of about $25,000.00 in cash, as well as assuming Tzovaras's liability to a third party on the lease of the premises of almost $700.00 a month.

(2) Cho operated this business for about eighteen months, selling it on December 30, 1980, for $120,000.00 to Lee, with Lee assuming the lease obligations,[1] the Underhill note having a balance of $19,608.27 payable in monthly installments of $526.00, the balance on the Tzovaras note in the principal sum of $25,104.90 payable in monthly installments of $558.23, and executing their note for the remainder of the purchase price in the principal sum of $50,286.63 payable in monthly installments of $1,068.04. It is this note which is the subject of this litigation, it being secured by a security agreement on the business and its assets.

(3) On April 16, 1981 (Plaintiffs' Exhibit 4), Lee sold the restaurant business to Yi, apparently for the same purchase price of $120,000.00, with assumption of essentially the same obligations Lee undertook in his agreement with Cho. Lee did not tell Cho of this sale and never got permission from Cho or the landlord, as required both in the security agreement and the lease

---

[1] Cho remaining as surety, however (Plaintiffs' Exhibit 3).

by which Cho and Lee were bound. Yi only paid $12,211.61 down, the balance being financed entirely by assumption of the Underhill, Tzovaras and Cho-held notes, with Lee taking Yi's note in the sum of $18,000.00. The house of cards must have collapsed four to six weeks later, prior to the time Cho discovered the unauthorized sale to Yi.

(4) On June 30, 1981, Cho sold the restaurant business to Young Cha You and Wan Jin Kim (hereafter You and Kim) effective June 15, 1981, for the sum of $60,000.00, with appropriate assumption of the lease, then having a monthly rental payment of $782.88 because of the escalation clauses therein, the unpaid principal balances on the Underhill and Tzovaras notes, together with the preceding two and one-half months' payments then in arrears and payment of $14,621.33 in cash, of which $8,000.00 was owed in real estate commissions by Cho on his original sale to Lee. Cho's discovery of the unauthorized sale to Yi came about when he called the place of business on the telephone and got no answer in late April or early May of 1981. He then had Mrs. Akisson, who had been the real estate agent both in his purchase from Tzovaras and his sale to Yi, investigate the matter. She found that Yi had abandoned the property some time before, the monthly payments on the rent, Underhill and Tzovaras notes had not been made and all three were then in arrears. Upon discovery of this situation, Cho retained counsel and wrote Lee and Yi May 20, 1981 (Plaintiffs' Exhibit 5), calling attention to the various breaches and specifically noting the breach in the obligation for monthly payment of his note of $50,286.83 and at least one month's unpaid rent but advising that he was unaware of the status of the monthly payments on the Underhill and Tzovaras notes. Both Lee and Yi were put on notice that these obligations would have to be brought current in ten days and that all of Cho's rights under the security agreement were reserved.

As soon as Mrs. Akisson knew of the default and the closing of the restaurant, she arranged for an inspection of the restaurant with Lee's real estate agent, a Mrs. Sarazen, who had represented Lee at the purchase from Cho, Lee apparently giving Mrs. Sarazen a key to deliver to Mrs. Akisson.

Lee did not testify. Mrs. Sarazen testified that Lee was not interested in resuming possession because his wife was ill and he could not run the restaurant.

Mrs. Akisson said that by this time she had been called by not only Underhill and Tzovaras but also the landlord, making demands for payment of the monthly installments in arrears, and she asked them to withhold action to give her an opportunity to remedy the default in some manner. Mrs. Akisson felt the property could not be multiple listed and publicly advertised because of a doubt as to its ownership, but the Court finds she did make active efforts to sell the property during the ensuing period from at least one month and possibly as much as two months, passing the word among other agents that the property was for sale and she described what she had done as the customary way of listing this type of property for sale under these circumstances. She called a number of prospective customers, most of whom were not interested because the business had been closed as an apparent failure. At first she offered the property at $100,000.00 but all of the customers said the price was too high, and she then listed it for an extended period at $85,000.00 without success. She described and the Court finds the $60,000.00 price as a fair one considering the circumstances of this closed restaurant and the then-depressed economy. She felt that the best price which could be obtained was by selling the business as a unit and that if it had been dismantled and sold it would have had practically no value. Mrs. Akisson was contradicted as to the value of the property by Lee's agent, Mrs. Sarazen, who felt the property was worth about $90,000.00 when she delivered the key and that if the restaurant had been closed and the physical assets sold it should have netted about $80,000.00. One of her basic assumptions was that the seller would provide some of the financing. While Mrs. Sarazen said she had sold more commercial real estate, including restaurants, than Mrs. Akisson, the Court believes that Mrs. Akisson's estimate of the value of the business was the more realistic under the circumstances. The Court also notes that Mrs. Sarazen made no suggestions back in May of 1981 as to how the property could be marketed and was apparently content to hand over the key and then criticize the performance *after* the sale was made.

By the first of June, it became obvious that the property could not be sold at the then listed price of $85,000.00, and Cho and his attorney both wrote Lee and Yi, notifying them that a private sale would be held within the next five days after June 8, 1981, at an approximate price of $60,000.00 (Plaintiffs' Exhibits 6 and 7). No response was made to either letter, and the sale was consummated on June 30, 1981, at that price. Although neither of the above letters offered the debtors the right to cure the default or to purchase at the stated price and might have been construed as an announcement of an accomplished sale, the Court finds that Plaintiffs' Exhibit 6 describes a sale *in futuro*[2] and the sellers would have had the right to secure an injunction under Virginia Code § 8.9-507(1) if they felt the property was not being sold in a commercially reasonable manner.

(1) *Was the sale of the restaurant/carry-out food business conducted in a commercially reasonable manner as required by Virginia Code Section 8.9-504(1), (3)?*

This issue is a creature of statute arising out of a desire of the legislature to correct abuses by unscrupulous creditors in foreclosure of liens upon personal property. In deciding this issue, the Court must chart its course between conflicting policy decisions. As one Texas Court pointed out:

> The question of what constitutes commercial reasonableness is sometimes a difficult one. A distinguished commentator has noted that Section 9.504 "attempts to chart a path in the narrow area between two policy positions; one, a desire to impede dishonest dispositions, and the other a reluctance to strangle honest transactions with red tape." Hogan, *The Secured Party in Default Proceedings Under The UCC*, 47 Minn. L. Rev. 219-20 (1962).
> A secured party is often placed on the horns of a dilemma. If he does sell, the debtor

---

[2] "Will sell the restaurant within the next five days."

may complain that he should have waited for a higher offer. If he does not sell because he thinks the price might be deemed inadequate, the creditor may ultimately be obligated to sell at a lower price, in which case the debtor will possibly claim the secured party's failure to go forward with the initial sale violated commercial reasonableness. *Pruske v. National Bank of Com. of San Antonio*, 533 S.W.2d 931 (Tex. Ct. Civ. App., San Antonio 1976).

Virginia Code § 8.9-507(2) attempts to give the Court some guidelines in its determination of whether a sale has been made in a commercially reasonable manner, providing three separate tests: (1) a sale in the usual manner in any recognized market therefor; or (2) sale at the price current in such market at the time of sale; or (3) otherwise sold in conformity with reasonable commercial practices among dealers in the type of property he has sold in a commercially reasonable manner.

If the evidence shows a compliance with any one of the three methods, the creditor is entitled to a deficiency judgment. Counsel have pointed out the disagreement among the authorities as to where the burden of proof lies, the majority apparently imposing that burden upon the creditor, the minority only requiring the creditor to carry the initial burden of going forward with the evidence but imposing the risk of non-persuasion upon the debtor, with two Federal cases construing Virginia law as placing the risk of non-persuasion upon the creditor, sect. 623, *Secured Transactions*, 69 Am. Jur. 2d, pages 520-531. *In re Bishop*, 482 F.2d 381 (4th Cir. 1973); *In re Thomas*, 12 UCC Reporting Service 578 (Bankr. W.D. Va. 1973). Without deciding where the risk of non-persuasion lies, the Court has found as a fact that the creditor has carried that burden as to all material aspects of this case.

While requiring the creditor to proceed in good faith, § 8.1-203 Virginia Code, and in a commercially reasonable manner, § 8.9-504 and § 8.9-507, Virginia Code, nevertheless we must give him the benefit of all the circumstances facing him at the time. In this particular case, we have a creditor whose debtor has "walked away"

from the store, handed him the key and left him to his own devices. The preponderance of the evidence showed that not only was the market depressed generally in all property, but particularly with this property since it had been closed over an extended period and every day it remained closed it further depreciated in value. This, coupled with the inevitable clamor of the two creditors and the landlord, who had claims against both seller and buyer accruing at almost $2,000.00 a month, insurance and other recurring charges, risks of a vacant building, not to mention his own claim accruing at over $1,000.00 a month, meant that this creditor had a "tiger by the tail." Putting ourselves in this position, we review the evidence and his debtors' criticism of what he did.

Lee contends that the price alone, 50% of the price he paid some six or seven months previously, shows that the disposition was in a commercially unreasonable manner, citing *Mercantile Financial Corp. v. Miller*, 7 UCC 402 (E.D. Pa. 1968) ($750,000.00 versus $19,000.00 according to one witness). While Mrs. Sarazen opined that from $80,000.00 to $90,000.00 could have been obtained if the sale had been conducted in a different manner, either by closing the restaurant and liquidating the physical assets or perhaps by a more extensive and extended listing and advertising,[3] coupled with financing provided by Cho,[4] the Court believes this is simply an opinion untested by any specific offer or testimony by a person ready, willing and able to buy at the prices she had suggested. The price does represent a great disparity between December and June, but the fact that the store had been closed for some time, coupled with a generally depressed market, easily explains it. Several prior cases have approved lien creditors to recover deficiencies in even greater

[3] My trial notes don't indicate she suggested a more extensive advertising or marketing, including a multiple listing, but she may well have done so.

[4] Counsel has echoed this in his argument, citing no cases so holding and ignoring the fact that Cho IS providing financing even now; his credit is "on the line" for more than $40,000.00 on the Tzovaras and Underhill notes, not to mention his liability on the lease. The Court finds there was no obligation to provide ADDITIONAL financing.

disparities where "going businesses" were closed and the creditors had to sell them under those circumstances. Fifteen thousand dollars realized from sale of $97,000.00 worth of marine goods and hardware inventory at a private noticed sale, *In re Nellis,* 22 UCC Reporter 1318 (Bankr. E.D. Pa. 1977); sale of fire lighter and butane fuel for $500.00 where the fair market value was held to be $27,616.00, the business being closed and the merchandise being "distressed," *Sierra Financial Corp. v. Brooks-Farrer Co.,* 15 Cal. App. 3d 698, 93 Cal. Rptr. 422 (Cal. App. 2d Dist. 1971).[5]

A depressed general market at the time of sale is also a factor and justified the sale of mobile homes in bulk at a letter over 20% less than what was owed on them,[6] *Pruske v. National Bank of Commerce of San Antonio,* 523 S.W.2d 931, 935 (Tex. Ct. of Civ. App. San Ant. 1976).

While the Court cannot find that Lee was obstructive, certainly to the extent Farrer was in *Sierra Financial* or one of the principals was in *Old Colony Trust Co. v. Penrose Industries Corp.,* 398 F.2d 310 (3d Cir. 1968), nor can it find any express acquiescence in the manner of sale so as to constitute a waiver as in *Brody v. James,* 223 A.2d 35 (App. Div. Sup. Ct. N.J. 1966), where the debtor gave oral consent to a private re-sale, the debtor's turning his back upon the security, coupled with his failure to object to the proposed sale or to take any action to enjoin it under § 8.9-507(1), is a part of the totality of the circumstances required to be considered by the Court. Several cases support this view. *Chicago City Bank and Trust Co. v. Wilson,* 407 N.E.2d 964 (App. Ct. Ill. 1st Dist. 5th Div. 1980), "defendant did not

---

[5] There are some differences from this case in that Sierra Financial was a public foreclosure sale at which time the debtor was present and the party complaining of the sale who had "staged" a prior purchase from the debtor was notified and could have been present at the sale, had also refused to release the merchandise for display so that its exact quantity and condition would be ascertained at the time of sale.

[6] This case does put the burden of proving commercial unreasonableness on the debtor.

show any attempt to redeem the vehicle or protect his interests"; *Application of Fickle*, 303 N.E.2d 541 (App. Ct. Ill. 1st Dist. 4th Div. 1973), "debtors did nothing prior to, or at the sale, with reference to the method, manner, time, place or terms of sale. They were represented by counsel at the sale, who made no objections," *Id.*, at 543-544; *First National Bank & Trust Company of Enid v. Holston*, 559 P.2d 440 (Okla. 1976), "The debtor made no attempt to restrain the sale [of a grocery store which had been closed for five days when the creditor took possession] or secure other buyers," *Id.*, at 445, noting his failure to seek a restraining order under § 8.9-507(1), *Id.*, at 444.

The Court has carefully reviewed all the authorities cited and believes that the evidence clearly preponderates in favor of the commercial reasonableness of the sale.

(2) *If the sale was not conducted in a commercially reasonable manner, what rights, if any, does the secured party have against the debtor?*

This need not be decided in view of the Court's holding.

(3) *If the debtor is liable, to what extent is the debtor's purchaser liable to the debtor?*

Clearly Yi is responsible for whatever Lee must pay Cho under the unambiguous terms of the contract signed by Yi, and the Court so adjudicates. This adjudication has already been made in a separate Order previously sent Mrs. Yi and all counsel.

Counsel for Cho will draw an appropriate Order in conformity with this opinion, reserving the objections and exceptions of Lee.

The Court must now decide the remaining issues between Lee and Yi and perhaps others, and this is fixed for hearing on the evidence on Friday, May 21, 1982.